**In re ADDISON PROPERTIES LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 95 B 8970.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Aug. 29, 1995.

William J. McKenna, Jr., Hopkins & Sutter, Chicago, IL, for Inland Mortgage Investment & Addison Court Limited Partnership.

Jay S. Geller, Jenner & Block, Chicago, IL, for Home Savings of America, F.A.

Melanie Rovner Cohen, Faye B. Feinstein and Michael M. Eidelman, Altheimer & Gray, Chicago, IL, for debtor.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

This Chapter 11 case is before the court on the motion of the debtor in possession to pay a $10,000 postpetition retainer to its counsel, Altheimer & Gray. The only funds available to pay the requested retainer are cash collateral, which can be used only if the interest of the creditor in the debtor's property is adequately protected. As discussed below, the interest of a secured creditor, for purposes of adequate protection, should be measured as of the beginning of the case. With this ruling, the pending motion will be set for a hearing at which the debtor will have the

burden of demonstrating that the interests of the secured creditors in the present case will not be harmed by payment of the requested retainer.

## Findings of Fact

This is a single-asset real estate case, commenced by a voluntary Chapter 11 petition filed on May 4, 1995. The debtor, Addison Properties Limited Partnership, is an Illinois limited partnership that, through a land trust, owns seven apartment buildings (the "property"). Three creditors have secured interests in the property. The first priority security interest is held by Home Savings of America, F.A. ("Home Savings"). Second and third priority security interests are held, respectively, by Inland Mortgage Investment Corporation ("Inland Mortgage"), and Addison Court Limited Partnership ("Addison Court"). All three creditors also hold separate security interests in the rents and income generated by the property. The parties agree that, at the time of the filing of the bankruptcy case, Home Savings was oversecured, but the extent to which the claims of Inland Mortgage and Addison Court were secured is in dispute. Either there was enough collateral value to secure only part of Inland Mortgage's claim (leaving Addison Court's claim wholly undersecured), or there was enough collateral value to secure all of Inland Mortgage's claim and part of Addison Court's. In either event, one of the creditors held a partially secured claim.

Since early June, the debtor has been operating the property under an agreed cash collateral order that provides (1) for the ordinary operation and maintenance of the property, (2) for segregation of funds for payment of real estate taxes, (3) for regular payments on Home Savings' mortgage, and (4) for the retention by the debtor of all remaining proceeds (estimated to be about $26,000 through September). The order specifically prohibits the debtor from paying fees to counsel or other bankruptcy professionals except pursuant to court order.

The issue presently before the court arises in connection with the debtor's employment of legal counsel. Pursuant to Section 327 of the Bankruptcy Code (Title 11, U.S.C., the "Code"), the debtor applied for and obtained court approval to employ a Chicago law firm, Altheimer & Gray ("A & G"), as its bankruptcy counsel. There was no objection to this employment. However, the debtor also sought authorization to pay to A & G a retainer of $10,000. The only source for the payment of such a retainer would be net rental proceeds collected by the debtor. Home Savings raised no objection to payment of the proposed retainer, but Inland Mortgage and Addison Court did object, and, after discussion between counsel and the court, the matter was briefed and taken under advisement.

## Conclusions of Law

■ *Background.* The legal background of the present dispute is not complicated. A & G is apparently seeking payment of a retainer in order to reduce the risk that it will not be paid for the services it is providing to the debtor. The fees of bankruptcy professionals employed by a debtor in possession are administrative expenses—awarded under Section 330(a) or Section 331 of the Bankruptcy Code, accorded administrative status by Section 503(b)(2), and assigned a first priority by Section 507(a)(1). However, status as an administrative claim is often insufficient to guarantee payment. If there are not enough assets in a debtor's estate to pay all administrative claimants in full, the claimants are paid pro rata, and any payment made on an interim basis, pursuant to Section 331, is subject to disgorgement. *In re Lochmiller Industries, Inc.,* 178 B.R. 241, 251 n. 41 (Bankr.S.D.Cal.1995) (collecting authorities). A & G seeks to hold a retainer, paid now from the debtor's estate, as security for any fees and costs ultimately awarded by the court.[1]

---

1. The debtor's application to retain A & G makes it clear that a "security" retainer is intended, rather than a prepayment of fees: the firm intends to submit fee applications pursuant to Sections 330 and 331, with the retainer being applied pursuant to further orders of the court. See *In re McDonald Bros. Construction, Inc.,* 114

B.R. 989, 997–1000 (Bankr.N.D.Ill.1990), for a description of the different types of retainers. The operation of "security" retainers, paid by the debtor *before* the filing of a bankruptcy case, is also discussed in *In re Burnside Steel Foundary Co.,* 90 B.R. 942, 944 (Bankr.N.D.Ill.1988). There is some question whether a court should

The debtor cannot, however, pay the requested retainer on its own authority. Section 363(b)(1) of the Code provides that a trustee (and hence, a debtor in possession) may use estate assets out of the ordinary course of business only after notice and a hearing.[2] Paying bankruptcy professionals is not in the ordinary course of business. More pertinently, Section 363(c)(2) provides that a trustee may not use cash collateral unless each creditor holding an interest in the collateral consents, or unless the court, after notice and a hearing, authorizes the use. The rents from the debtor's property are, according to the uncontested allegations of the secured creditors, cash collateral.[3] Because Inland Mortgage and Addison Court oppose the use of the rents to pay the retainer sought by A & G, this court must decide whether to authorize the use of cash collateral under Section 363(c)(2) for that purpose.

■ In making that decision, adequate protection is the key issue. It is well established that cash collateral may appropriately be used to pay administrative expenses, like A & G's requested retainer, if the interest secured by the collateral is adequately protected, but not otherwise. *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir.1992) (affirming authorization of the use of rents to pay professional fees where the secured creditor's interest was adequately protected); *In re 680 Fifth Avenue Assocs.*, 154 B.R. 38, 41 (Bankr.S.D.N.Y.1993) (denying use of rents to pay administrative expenses where

debtors failed to prove that the secured creditor's interest would be adequately protected); *see* 11 U.S.C. § 363(e) (when requested by an entity having an interest in property of the estate, the court must prohibit use of the property or condition the use "as is necessary to provide adequate protection of [the creditor's] interest"). Moreover, since A & G is seeking a security interest in cash that is already subject to a lien, adequate protection is also required by Section 364(d)(1)(B) (requiring "adequate protection of the interest of the holder of [a] lien on property of the estate on which [a] senior . . . lien is proposed to be granted").

■ Although the question was once in substantial doubt, it is now established that "adequate protection" is meant only to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property, rather than to compensate the creditor for the bankruptcy-imposed delay in enforcing its rights in that property. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Where a creditor is threatened with a decline in the value of its collateral, the Bankruptcy Code provides that the estate must protect the creditor's interest, either by periodic payments or substitute liens covering the decline, or by some other means that provides the "indubitable equivalent" of the creditor's interest in the estate's property. 11 U.S.C.

---

ever allow a security retainer to be paid postpetition to a bankruptcy professional. At least one court has denied a request for a postpetition security retainer, noting that such a retainer upsets the system of priorities that the Code establishes for the payment of administrative expenses. *In re Cal–Inland, Inc.*, 124 B.R. 551, 554 (Bankr.D.Minn.1991). However, Section 328(a) expressly authorizes employment of professionals "on any reasonable terms and conditions of employment, including on a retainer." In a particular case, it may well be that the debtor can obtain better professional assistance, with less expense to the estate, if the professionals receive assurance of payment through a retainer. There should be no presumption against approving employment arrangements that include this explicitly authorized option.

**2.** Section 363 places its restrictions on the use of estate property by a "trustee," but the restric-

tions are applicable to debtors in possession pursuant to Section 1107(a). *In re Wooten*, 82 B.R. 84, 87 (N.D.Iowa 1986).

**3.** "Cash collateral" is defined for purposes of Section 363 as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a). The three secured creditors in the present case claim to have an interest in the debtor's rents pursuant to their assignment of rents. The debtor does not dispute this claim, and, if the assignments of rents were properly recorded, it would appear that their claim to an interest in the rents is valid. See *In re Wheaton Oaks Office Partners Ltd.*, 27 F.3d 1234 (7th Cir.1994) (recorded assignment of rents was sufficient to establish a claim to rents giving rise to cash collateral status).

§ 361. In the absence of such "adequate protection," a creditor threatened with a decline in the value of its interest in the estate's property is entitled to relief from the automatic stay to pursue its remedies against the property in which it has an interest. 11 U.S.C. § 362(d)(1).

The ultimate question raised by the pending motion is thus whether payment of the retainer sought by A & G would cause or threaten a decline in the value of the interests of the objecting secured creditors in the property of the debtor's estate. That question is a difficult one, because it requires a determination of the protectible interest of the secured creditors. The determination of the interests of secured creditors, for purposes of adequate protection, in the context of an assignment of rents, is not directly addressed by the Bankruptcy Code, and has produced a large number of conflicting judicial opinions and academic commentaries.[4]

*The relevant Code provisions.* There are at least four provisions of the Bankruptcy Code that bear on the protectible interest of a secured creditor, holding both a mortgage and an assignment of rents, in property of a debtor's estate.

● *Claim bifurcation.* Initially, the interest of a secured creditor in property of the estate may be affected by Section 506(a) of the Code. This is the provision that bifurcates undersecured claims. Under Section 506(a), the total claim ("[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest") is split into (1) a *secured* claim, to the extent of the collateral value that supports the claim ("the value of such creditor's interest in the estate's interest in such property") and (2) an *unsecured* claim to the extent that it is not supported by collateral value (the amount by which "the value of such creditor's interest . . . is less than the amount of such allowed claim").[5]

● *Costs of preservation.* Section 506(c) has the effect of reducing the amount of collateral that secures a creditor's claim by allowing a trustee (or debtor in possession) to "recover from property securing an allowed secured claim, the reasonable, necessary costs and expenses of preserving . . . such property." This deduction from collateral, however, is limited to "the extent of any benefit to the holder" of the claim secured by the collateral.[6]

● *Proceeds of collateral.* Section 552(b) has the effect of increasing the amount of collateral that secures a claim. Although Section 552(a) provides that property acquired by an estate postpetition is generally not subject to any lien resulting from a prepetition security agreement, Section 552(b) allows prepetition security interests to extend to various proceeds of the prepetition collateral, including, in Section 552(b)(2), "amounts paid as rents" of the collateral. This extension of liens is expressly subject to Section 506(c), as well as to various avoidance provisions of the Code, and is subject to an "equities of the case" exception, allowing a court, after notice and a hearing, to order

4. Law review articles commenting on the issue, and discussing the conflicting case law, include Craig H. Averch et al., *The Treatment of Net Rents in Bankruptcy—Adequate Protection, Payment of Interest, Return of Collateral, or Reduction of Debt,* 48 U.Miami L.Rev. 691 (1994); David G. Carlson, *Adequate Protection Payments and the Surrender of Cash Collateral in Chapter 11 Reorganization,* 15 Cardozo L.Rev. 1357 (1994); and Bonnie K. Donahue & W. David Edwards, *The Treatment of Assignments of Rents in Bankruptcy: Emerging Issues Relating to Perfection, Cash Collateral, and Plan Confirmation,* 48 Bus.Law. 633 (1993).

5. Section 506(a) provides in pertinent part:
An allowed claim of a creditor secured by a lien on property in which the estate has an

interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

6. Section 506(c) provides:
The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

that the lien not extend to certain rents.[7]

● *Postpetition interest and costs.* Ordinarily, claims in bankruptcy are not allowed to accrue interest postpetition; thus, Section 502(b) provides for the disallowance of any claims for interest that is unmatured as of the date of the filing of the bankruptcy petition. However, Section 506(b) provides an exception to this rule for oversecured claims. It allows the amount of a secured claim to be increased by postpetition interest (and by "reasonable fees, costs or charges provided for under the agreement under which such claim arose") to the extent that the collateral value exceeds the secured claim. Again, this provision is expressly subject to the reduction of collateral allowed by Section 506(c).[8]

*Judicial application.* In applying these provisions to bankruptcy cases involving adequate protection of claims secured by mortgages and assignments of rents, the judicial decisions generally suggest two approaches to determining protectible interest, each of which presents difficulties.

*1. Single valuation.* The simpler of the two approaches is employed in several of the decisions cited by the debtor, including *Confederation Life Insurance Co. v. Beau Rivage Ltd.*, 126 B.R. 632 (N.D.Ga.1991); *In re Kalian*, 169 B.R. 503 (Bankr.D.R.I.1994); and *In re Reddington/Sunarrow Ltd.*, 119 B.R. 809 (Bankr.D.N.M.1990). These decisions effectively hold that a bifurcation under Section 506(a), made as of the filing of the case, fixes the interest of the secured creditor in the property of the estate for all purposes, including adequate protection. If a secured creditor's interest in property of the estate is insufficient, as of the filing date, to fully secure its claim, the creditor has (1) a secured claim, fixed at the value of the property securing the claim on the petition date, (2) an unsecured claim, fixed at the difference between that property value and the amount of the total claim, and (3) no right to postpetition interest under Section 506(b) because the secured claim is not oversecured. The only need for adequate protection is to prevent (or cure) a decline in the value of the property securing the interest fixed as of the petition date. Thus, if the value of that property remains constant, any proceeds that are additional collateral under Section 552(b) are not needed to provide adequate protection, and may be used for other purposes, such as paying the debtor's obligations under a plan of reorganization.

The *Reddington/Sunarrow* case presents a useful example of the single valuation approach. *Reddington/Sunarrow*, like the present case, was a single-asset Chapter 11 real estate case, involving an apartment complex. The real property, at the time of filing of the case, was worth $4.6 million. It served as security for a claim, as of the time of filing, of $5.4 million. The secured creditor also had an assignment of rents, and, during the course of the bankruptcy, the property generated net rents of $600,000 (the debtor having been allowed to use the remainder of the rents, presumably to maintain the property). The underlying property did not decline in value during the bankruptcy. The issue in the case was how the net rents should be treated.

The court addressed the issue in two steps. First, it concluded that the interest of a secured creditor should be established at the date of filing, relying particularly on the

7. Section 552(b)(2), as amended by the Bankruptcy Reform Act of 1994, Pub.L. 103–394 effective October 22, 1994, provides in pertinent part: Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property ..., then such security interest extends to such rents ... acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

8. Section 506(b) provides:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Court of Appeal's decision in the *Timbers* case:

> When *Timbers* was before the Fifth Circuit, the court's view was that Congress intended that a secured creditor be adequately protected only for the fixed amount of its allowed secured claim, an amount that is strictly limited to the value of the property securing the debt. *In re Timbers of Inwood Forest Assoc., Ltd.,* 793 F.2d 1380, 1386–87, n. 7 (5th Cir.1986) [*aff'd sub nom. United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ]. The court decided that the amount of the allowed secured claim should be determined as of the date of filing the petition. *Id.* at 1387.

119 B.R. at 813. Next, with the protectible interest of the secured creditor thus fixed at $4.6 million, and with no decline in the value of the underlying property, the court found no need to make payments to the secured creditor during the course of the bankruptcy, either for adequate protection or for postpetition interest under Section 506(b). "Whether the allegation is that the payments are adequate protection payments, interest payments, or lost opportunity costs, the Supreme Court in *Timbers* made it clear that an undersecured creditor whose collateral is not depreciating is not entitled to such payments." *Id.* Accordingly, the debtor could use the $600,000 in net rents for other purposes, without affecting the creditor's right to adequate protection of its interest in the debtor's property. Since the rents had, in fact, been paid to the creditor prior to confirmation, the debtor was free to treat them as prepayments of the debtor's obligation to pay the creditor's secured claim under a plan of reorganization. *Id.* ("If payments are made to an undersecured creditor [whose protectible interest is not declining in value], they must be allowed to reduce the allowed secured claim of the creditor.") In this way, the debtor was able to propose a plan that called for future payments on a secured claim of $4.0 million (the fixed claim of $4.6 million, less the $600,000 prepayment). Although the court did not discuss the matter, it is apparent from its analysis that the unsecured portion of the creditor's claim (the $800,000 difference between the total claim of $5.4 million and the initial collateral value of $4.6 million), fixed at the time of filing, would also continue through to confirmation, and need to be treated by the plan.

The single valuation approach can be illustrated graphically. In the following chart, a bankruptcy is posited in which the debtor has fixed assets worth $75 at the time of filing, securing a total claim of $100, and generating net cash proceeds of $2.50 per month. As in *Reddington/Sunarrow,* the value of the secured claim is fixed at the time of filing; the amount of that claim defines the secured creditor's interest subject to adequate protection, and is the secured claim for purposes of confirmation. Since the underlying collateral does not decline in value, the net cash proceeds are available for use by the debtor.

### Chart 1: Single Valuation
### Nonfluctuating Fixed Assets; Regular Cash Proceeds

a. *Effect of single valuation.* The practical consequence of single valuation is to balance the bankruptcy process in favor of the debtor in any case where the major creditor is secured by both the debtor's assets and by the income that those assets produce. As facts of *Reddington/Sunarrow* demonstrate, and as Chart 1 reflects, the longer a debtor remains in bankruptcy, accumulating income, the better will be its chances of confirming a plan, since the accumulated cash may be used to reduce the creditor's secured claim, which does not increase during the pendency of the case. *See In re Vermont Inv. Ltd. Partnership,* 142 B.R. 571, 574 (Bankr.D.D.C.1992) (noting that the single valuation approach creates a

9. However, as noted in *Timbers,* the potential for such delay is substantially reduced by the requirement that relief from stay be granted under Section 362(d)(1) whenever there is not "a reasonable possibility of a successful reorganization

"dramatic incentive ... on the part of the debtors to delay the case as long as possible").[9] Similarly, single valuation makes it likely that the debtor will have funds available to pay administrative expenses, since the income generated postpetition could be used for that purpose as well as for reduction of the secured claim. The secured creditor, on the other hand, receives relatively little benefit from its lien on postpetition proceeds. Because these proceeds are cash collateral, they cannot be used without a court order, but because they are not needed for adequate protection (in the absence of a decline in the value of the underlying collateral), the court has no reason to deny to the debtor the use of these proceeds.

within a reasonable time." 484 U.S. at 375–76, 108 S.Ct. at 632–33 (quoting the circuit court opinion, 808 F.2d 363, 370, and citing numerous cases in which relief from stay was granted in less than a year from the date of filing).

*b. Difficulties with single valuation.* The single valuation approach to determining the protectible interest of a creditor secured by an assignment of rents has been subject to substantial criticism on at least three grounds. While the first two of these grounds are less compelling, the third presents a genuine conflict between the single valuation approach and the language of the Bankruptcy Code.

*i. Dewsnup v. Timm.* Several of the decisions rejecting single valuation have pointed to a statement in the Supreme Court's decision in *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992): "Any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, not to the benefit of the debtor and not to the benefit of other unsecured creditors ... who had nothing to do with the mortgagor-mortgagee bargain." *See, e.g., In re Union Meeting Partners,* 178 B.R. 664, 675 (Bankr. E.D.Pa.1995); *In re Bloomingdale Partners,* 155 B.R. 961, 975 (Bankr.N.D.Ill.1993). Certainly there is tension between this statement and the single valuation approach, which results in increased value during bankruptcy going to the benefit of the estate. However, the context of *Dewsnup* must be remembered in assessing the impact of its observation. *Dewsnup* was a Chapter 7 case, in which the property securing the creditor's claim was abandoned, and the question before the Court was whether Section 506(d) of the Bankruptcy Code effected a "strip down" of the creditor's lien to the value of the collateral at the outset of the case. Thus, the decision had nothing to do with the question of when claims should be valued either for purposes of bifurcation under Section 506(a) or for purposes of adequate protection. Indeed, the opinion was careful to restrict its reach to the narrow issue then before the Court: "We ... focus on the case before us and allow other facts to await their legal resolution on another day." 502 U.S. at 416–17, 112 S.Ct. at 778. Moreover, the Court recognized that the effect of reorganization on secured creditor's liens might be different from the effect of a "straight bankruptcy" liquidation in Chapter 7: *"Apart from reorganization proceedings* ... no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt." 502 U.S. at 418–19, 112 S.Ct. at 779 (emphasis added). The Seventh Circuit has recently warned repeatedly against applying in reorganization proceedings the adage that liens pass through bankruptcy unaffected. *In re Penrod,* 50 F.3d 459, 462–63 (7th Cir.1995) (noting that reorganization plans may abrogate lien rights, and rejecting decisions by courts that were "mesmerized" by the adage); *In re James Wilson Assocs.,* 965 F.2d 160, 171 (7th Cir.1992) (allowing the use of cash collateral rents to pay attorneys fees where the creditor's claim was oversecured, and stating "the adage that liens pass through bankruptcy unaffected cannot be taken at face value").

*ii. Section 552(b).* A second criticism directed at the single valuation approach is that it fails to give effect to Section 552(b), which, as noted above, allows certain prepetition liens to extend to postpetition proceeds, including rent. In *Timbers,* the Supreme Court contrasted the effect of Section 552(b) with the claim made by the secured creditors in that case to adequate protection payments for the use value of their collateral:

Section 552(b) ... makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of the unsecured creditors. Under [creditor's] interpretation, however, the undersecured creditor who lacks such a perfected security interest in effect achieves the same result by demanding the "use value" of his collateral under § 362.

484 U.S. at 374, 108 S.Ct. at 632. This discussion is cited in *In re Union Meeting Partners,* 178 B.R. 664, 676 (Bankr.E.D.Pa. 1995), and *In re Flagler–At–First Associates, Ltd.,* 114 B.R. 297, 303 (Bankr.S.D.Fla.1990), in support of the proposition that Section 552(b) must result in an increase in a creditor's secured claim during the pendency of the bankruptcy. *Timbers* says no such thing. Rather, without commenting on how a secured creditor's claim is valued, *Timbers* simply states that Section 552(b) results in proceeds or rents being made available to satisfy that claim. The single valuation ap-

proach is not inconsistent with this observation. It fixes the value of the secured claim as of the beginning of the case, and then protects that value. In a situation where the underlying collateral was *declining in value*, the single valuation approach would require that proceeds constituting cash collateral under Section 552(b) be applied to the secured claim before being used for any other purpose. Only where the underlying collateral maintains its value is the cash collateral able to be used, and this is only because satisfaction of the secured creditor's claim is already assured. Thus, contrary to the suggestion of *In re Bloomingdale Partners*, 155 B.R. 961, 976 (Bankr.N.D.Ill.1993), single valuation does not render Section 552(b) "a practical nullity and theoretical absurdity" (quoting *Timbers*, 484 U.S. at 375, 108 S.Ct. at 632).

*iii. Separate valuation for confirmation.* The remaining criticism of the single valuation approach is based on the second sentence of Section 506(a), the bifurcation provision of the Code. It states that the valuation of the claims of a creditor secured by property of the estate shall be determined (1) "in light of the purpose of the valuation and of the proposed disposition or use of such property", and (2) "in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." On its face, this language appears to contradict the idea that there can be only a single valuation of a secured creditor's interests: the language appears to require, at the very least, that there be a separate valuation hearing, with claim bifurcation, in conjunction with any hearing on plan confirmation. This was the holding of *In re Landing Associates, Ltd.*, 122 B.R. 288, 293 (Bankr.W.D.Tex.1990) ("[T]he value of a secured claim for confirmation purposes is determined as of the confirmation date...").

This criticism of single valuation is well grounded. Apart from the actual text of Section 506(a), the legislative history forcefully rejects single valuation. As proposed in the original draft of the legislation that became the Bankruptcy Code—H.R. 8200, 95th Cong., 1st Sess. (1977)—Section 506(a) provided only for bifurcation. It read, in its entirety:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, and is an unsecured claim to the extent that such value is less than the amount of such allowed claim.

The Senate, in S.2266, 95th Cong., 2d Sess. (1978), added the language that now appears in the second sentence of Section 506(a). The change was quite intentional, according to the report that accompanied the bill:

> While courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property. This determination shall be made in conjunction with any hearing on such disposition or on a plan affecting the creditor's interest. *To illustrate, a valuation early in the case in a proceeding under sections 361–63 would not be binding upon the debtor or creditor at the time of confirmation of the plan.*

S.Rep. No. 95–989, 95th Cong., 2d Sess. 68 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5854 (emphasis added). The Senate version of Section 506(a) was accepted in the compromise bill submitted to both houses, again, with express statements by the managers of the intended effect:

> Additionally a determination of what portion of an allowed claim is secured and what portion is unsecured is binding only for the purpose for which the determination is made. *Thus determinations for purposes of adequate protection is [sic] not binding for purposes of "cram down" on confirmation in a case under chapter 11.*

124 Cong.Rec. H11095 (daily ed. Sept. 28, 1978), S17411 (daily ed. Oct. 6, 1978) (emphasis added). These indications of Congressional intent, reinforcing the language of Section 506(a), make it impossible to accept the single valuation approach. A determination of the value of a secured creditor's interests for purposes of adequate protection cannot determine value for plan confirmation.

*2. Continuous valuation.* Inland Mortgage and Addison Court have argued that an alternative to the single value approach should be applied in determining the protectible interest of a creditor secured by both fixed collateral and its proceeds. Their approach, which can be referred to as "continuous valuation," is based on the reasoning employed by most of the decisions that reject single valuation, including *In re Union Meeting Partners,* 178 B.R. 664 (Bankr.E.D.Pa. 1995); *In re Columbia Office Associates Limited Partnership,* 175 B.R. 199 (Bankr. D.Md.1994); *In re Bloomingdale Partners,* 155 B.R. 961 (Bankr.N.D.Ill.1993); and *In re Flagler–At–First Associates, Ltd.,* 114 B.R. 297 (Bankr.S.D.Fla.1990). None of these decisions deal explicitly with the question of adequate protection, rather, they address the value of a secured claim at confirmation, and hold that the value at confirmation must take into consideration any proceeds that have come into the estate under Section 552(b).[10] Inland Mortgage and Addison Court read these decisions to support a continuous valuation approach: that is, as Section 552(b) proceeds (such as rents) come into an estate, they should first be expended to preserve the underlying collateral, pursuant to Section 506(c), and should then be seen as increasing the collateral used to value the creditors' secured claims under Section 506(a). In this way, the valuation process under Section 506(a) proceeds continuously until the collateral is disposed of or a plan is confirmed. Each receipt of net proceeds by the debtor results in a new secured claim, subject to adequate protection. As a result, a claim that was undersecured at the beginning of the case can grow, as net proceeds accrue, until the claim is no longer undersecured (because the value of the collateral equals the amount of the creditor's total prepetition claim). At that point, further increases in collateral caused by the net proceeds would result in funds being available, under Section 506(b), to pay interest and costs for the now *oversecured* claim.[11]

*In re Union Meeting Partners,* 178 B.R. 664 (Bankr.E.D.Pa.1995), illustrates the continuous valuation approach advocated by Inland Mortgage and Addison Court. *Union Meeting* was another single-asset real estate case, this time involving office buildings. The property was initially valued at $6,600,000, and secured a claim of about $9,364,000. By the time of hearing on the debtor's fourth amended plan of reorganization, the court found that the value of the property had increased to $6,800,000. 178 B.R. at 672–74. The rents from the property were found by the court to be security for the creditor's claim, pursuant to Section 552(b), and these rents were paid over to the creditor during the course of the bankruptcy proceedings. By the time of the confirmation hearing,

10. Two other decisions cited by Inland Mortgage and Addison Court—*Federal National Mortgage Ass'n v. Dacon Bolingbrook Assocs.,* 153 B.R. 204 (N.D.Ill.1993), and *In re 680 Fifth Avenue Assocs.,* 154 B.R. 38 (Bankr.S.D.N.Y.1993)—do deal with adequate protection, but do not address the question of when to value the interest of the secured creditor that must be protected. Rather, these decisions assume that if rents are cash collateral, the full amount of the rents must be adequately protected. That assumption conflicts with the concept of adequate protection embodied in Sections 361–63 of the Code. As the Seventh Circuit stated in *In re James Wilson Assocs.,* 965 F.2d 160, 171 (7th Cir.1992), a secured creditor "has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest."

11. Another alternative to single valuation holds that a bifurcation pursuant to Section 506(a) fixes the secured claim for purposes of allowance and adequate protection, but that valuations of collateral for purposes of allowing interest under Section 506(b) should take place throughout the case. Thus, as net proceeds come into the estate, they result in the fixed secured claim being oversecured, so that interest (and contractual costs) must be paid on the claim. This approach is advocated in Craig H. Averch et al., *The Treatment of Net Rents in Bankruptcy—Adequate Protection, Payment of Interest, Return of Collateral, or Reduction of Debt,* 48 U.Miami L.Rev. 691 (1994), and appears to have been applied in *In re Vermont Investment Ltd. Partnership,* 142 B.R. 571 (Bankr.D.D.C.1992). The principal difficulty with this approach, as with single valuation, is that the secured claim cannot be fixed at the beginning of the case for purposes of allowance at confirmation. Moreover, interest and costs under Section 506(b) are payable after deduction of the costs of preservation. This consideration, among others, led the court in *In re Delta Resources, Inc.,* 54 F.3d 722, 730 (11th Cir.1995), to hold that allowances under Section 506(b) are payable only at the time of confirmation.

these rents (presumably net of operating expenses) totalled about $1,442,000. The debtor sought application of the single valuation approach, which would have allowed the rents to decrease the creditor's secured claim for purposes of confirmation. 178 B.R. at 674. The court, however, rejected this request, agreeing with the creditor that "the amount of post-petition rents not reinvested into real estate increase [sic] the size of the creditor's secured claim, and payment of those rents to the creditor results in a 'wash' of that discrete increase, which in turn decreases the total amount of the creditor's claim but not the secured portion of its claim as measured by the value of the real estate." *Id.* The court cites *Dewsnup*, 502 U.S. at 417, 112 S.Ct. at 778, in support of the proposition that increases in the value of the creditor's collateral, "due to the operation of § 552(b), or even due to the happenstance of appreciation" should accrue to the benefit of the secured creditor. 178 B.R. at 675. The court also notes the ultimate impact of increasing the creditor's secured claim:

> Of course, it is possible that a creditor's secured claim which is expanding under § 552(b) may become so large as to eat up any deficiency and call into play § 506(b). At that point, the creditor would become entitled to interest on its claim. Any rents

collected beyond that ... would revert to the debtor.

*Id.*

Finally, the court performed a Section 506(a) bifurcation, for purposes of plan confirmation, in accord with this analysis. From the $6,800,000 property value, the court subtracted $235,000 in prior tax liens, to arrive at a net secured claim of about $6,565,000. The $1,442,000 in rents previously paid to the secured creditor were subtracted from the *unsecured* portion of the creditor's claim, as the continuous valuation approach requires, to arrive at a net unsecured claim of about $1,357,000 (total claim of $9,364,000, less secured claim of $6,565,000, less net rents of $1,442,000). 178 B.R. at 677–78.[12]

The impact of the continuous valuation approach in a typical single-asset case is illustrated in the following chart, using the same parameters as in Chart 1. Here, the value of the secured claim is not fixed at the time of filing, but increases with each month's net proceeds. The unsecured portion of the claim is correspondingly reduced, and ultimately, there is a surplus of collateral that can be used to pay interest and costs under Section 506(b). There are no funds available to the debtor, since all of the cash is needed to adequately protect the increasing secured claim and the creditor's right to interest.

---

**12.** The theory supporting this calculation of the unsecured claim is that the payment of rents to the secured creditor effected a "wash." The rents increased the secured portion of the claim when they were received as collateral (in this case to a total of $8,007,000—the $6,565,000 million real property value plus the $1,442,00 in rents), causing the unsecured portion of the claim to be reduced accordingly. The total claim of $9,364,000, less the increased secured claim of $8,007,000 resulted in an unsecured claim of about $1,357,000. The fact that the rents were actually paid to the secured creditor reduced the secured claim back to the value of the real estate, $6,565,000, but left the unsecured claim at $1,357,000.

**Chart 2: Continuous Valuation**
**Nonfluctuating Fixed Assets; Regular Cash Proceeds**

---

*a. Effect of continuous valuation.* In sharp contrast to the single valuation approach, the effect of continuous valuation is to balance the bankruptcy process heavily in favor of the creditor secured by a Section 552(b) lien on proceeds. Indeed, in a single-asset case, unless the creditor is substantially oversecured, so that the debtor can pay interest and costs and still have funds left over, or unless the debtor has an outside source of funds, the creditor has a veto on the bankruptcy case from the outset. This is because, without the creditor's consent, there will be no funds available for any of the administrative expenses that are required to keep the case alive. As noted earlier, cash collateral of a secured creditor cannot be used to pay administrative expenses unless the creditor's interest is adequately protected. *In re 680 Fifth Avenue Associates,* 154 B.R. 38, 41 (Bankr.S.D.N.Y.1993). And as illustrated in the *Union Meeting* decision and Chart 2, there is no adequate protection for the secured claim of a creditor under continuous valuation until cash collateral reaches a point of paying the creditor's total prepetition claim with interest and costs. Moreover, this situation is not limited to single-asset real estate cases. It has become increasingly rare to find any debtor in Chapter 11 that is not involved in sophisticated financing agreements imposing blanket liens on all of its assets, tangible and intangible, together with their proceeds. *See, e.g., In re Barrows,* 171 B.R. 455 (Bankr.D.N.H.1994) (dealing with questions of adequate protection in the context of blanket liens on a manufacturing concern). The continuous valuation approach implies that any such Chapter 11 debtor, unless the value of its business substantially exceeds the total claim secured by the creditor's blanket liens, cannot continue in Chapter 11 without the creditor's consent.[13]

**13.** Similar considerations influenced the Court of Appeals in *Timbers* to reject claims of underse-

cured creditors for payment of opportunity costs. "In many Chapter 11 cases ... the likely result

*b.  Difficulties with continuous valuation.* The principal argument made against the continuous valuation approach has already been noted: its critics contend that this approach conflicts with the rule of *Timbers* that undersecured creditors are not entitled to improve their position relative to other creditors during the pendency of the bankruptcy. *See, e.g., Reddington/Sunarrow,* 119 B.R. at 813, citing *Timbers,* 484 U.S. at 372, 108 S.Ct. at 630–31.  This criticism is not persuasive.  Just as *Dewsnup* is limited to interpreting Section 506(d), so *Timbers* is limited to defining the extent of adequate protection arising from the delay in foreclosure rights imposed by the automatic stay.  *Timbers* simply did not consider the question of whether Section 552(b) proceeds serve to increase the secured claim of an undersecured creditor.[14]  Nevertheless, there are difficulties with the approach that caution against its adoption.

*i.  Timing of adequate protection valuation.*  Although the language and legislative history of Section 506(a), as noted above, require that valuation of a secured claim for purposes of confirmation take place in conjunction with the confirmation hearing, there is no similar directive as to when claims should be valued for adequate protection purposes.  However, a number of courts have concluded that adequate protection is designed to safeguard the value of a creditor's collateral at the time of the filing of the bankruptcy.  For example, the district court in *In re Johnson,* 165 B.R. 524, 528 (S.D.Ga. 1994), a Chapter 13 case, commented as follows:

> The date the petition is filed and the bankruptcy case is commenced is the point where the secured creditor's rights are first impacted by the bankruptcy and the tension between adequate protection of such rights and a meaningful chance at rehabilitation under Chapter 13 for the debtor begins.  The logical point as of which to ascertain property interests that must be adequately protected throughout an ensuing Chapter 13 bankruptcy proceeding is the point where the bankruptcy begins—the date of filing.

(Citation omitted.)  One of the decisions often cited in support of continuous valuation, *In re Landing Associates, Ltd.,* 122 B.R. 288, 292 (Bankr.W.D.Tex.1990), makes the same point:

> It might well be appropriate to value property as of the filing date in order to evaluate whether a creditor's interest has been adequately protected.  After all, the function of adequate protection is to maintain the value of the creditor's interest in the property as of the filing date.

*Cf. In re Delta Resources, Inc.,* 54 F.3d 722, 729 (11th Cir.1995) ("Ordinarily, the matter of adequate protection is determined at or near the inception of a bankruptcy case.")[15]

of requiring periodic postpetition interest payments to undersecured creditors will be the immediate conversion to Chapter 7—a result which seems inconsistent with the congressional policy favoring attempts at reorganization." *In re Timbers of Inwood Forest Assoc., Ltd.,* 793 F.2d 1380, 1408 (5th Cir.1986), *aff'd sub nom. United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

**14.**  However, it is not difficult to see why critics of continuous valuation see this approach as contrary to *Timbers.*  The value of any income-producing property is the discounted value of the stream of income it generates—its "net proceeds."  *See* Leslie K. Beckhart, *No Intrinsic Value: The Failure of Traditional Real Estate Investment Methods to Value Income–Producing Property,* 66 So.Cal.L.Rev. 2251, 2285–2288 (1993).  By asking for market interest on this value to compensate for their delay in obtaining the property, the creditors in *Timbers* were thus asking for the equivalent of the net proceeds.

Or, to see it in another way, the creditors in *Timbers* might have simply argued that they should be paid the net proceeds, since, but for the bankruptcy, they could have foreclosed on the collateral and realized the rents themselves.

**15.**  A number of bankruptcy decisions have held that a secured creditor whose collateral is declining in value is only entitled to receive adequate protection payments "prospectively from the date of the request."  *See In re Kennedy,* 177 B.R. 967, 973 (Bankr.S.D.Ala.1995) (collecting authorities).  This does not contradict the principle that the claim subject to adequate protection is the value as of filing, it merely sets the point at which payments for a decline from that value should commence.  *In re Bear Creek Ministorage, Inc.,* 49 B.R. 454, 458 n. 11 (Bankr.S.D.Tex. 1985), *rev'd on other grounds sub nom. In re Timbers of Inwood Forest Assocs., Ltd.,* 793 F.2d 1380 (5th Cir.1986), *reversal aff'd sub nom., United Savings Association of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (holding that adequate protection is required from the date of

The continuous valuation approach departs from this traditional principle with no apparent justification.

*ii. Fluctuating asset value.* In addition to conflicting with judicial authority on the timing of adequate protection valuation, the continuous valuation approach creates highly questionable results when applied in a case where the property securing a claim fluctuates in value. Examples of such assets would include inventories of jewelry, which would fluctuate with the market price of precious metals and gems, and portfolios of common stocks or bonds. The traditional rule of adequate protection would only require a debtor to protect a creditor from a decline in the value of such collateral to a point below the value as of the filing of the bankruptcy. The following chart reflects the traditional approach to adequate protection, in a situation where assets initially worth $75 fluctuate between $60 and $110 during the course of the bankruptcy.

**Chart 3: Traditional Adequate Protection Valuation**
**Fluctuating Fixed Assets**

As shown in the chart, traditional adequate protection concepts require the debtor to make cash payments or supply replacement liens only to the extent, and for the periods, in which the value of the assets is lower that the creditor's interest in the collateral at the time of filing.

filing, but "adequate protection payments may not begin until after a motion for § 362(d) relief

Continuous valuation, in contrast, produces a "ratchet" effect, in which every increase in the asset value above the prior highest value requires adequate protection, producing the peculiar result shown in the next chart (using the same parameters as in Chart 3).

is filed").

**Chart 4: Continuous Valuation**
**Fluctuating Fixed Assets**

As this chart reflects, continuous valuation in bankruptcy dramatically enhances the rights of secured creditors, allowing them to demand the upside of any fluctuation in collateral value while being protected from any downside movements.

*iii. Fluctuating Net Proceeds.* A similar problem with continuous valuation exists when fixed assets securing a claim remain stable, but produce fluctuating amounts of proceeds. In some months, a business may produce proceeds well in excess of operating costs, while in other months, its proceeds are less than what is required to maintain operations. The traditional approach to adequate protection only requires the debtor to provide new protection if the accumulated cash, together with the fixed assets, produces a value below what existed at the date of filing. The following chart illustrates this approach in the situation of a business that has a positive cash flow during the first six months in bankruptcy, negative cash flow for the next four months, and a break-even cash flow for the final two months.

**Chart 5: Traditional Adequate Protection Valuation**
**Nonfluctuating Fixed Assets; Irregular Cash Proceeds**

Under this traditional approach, there is no need for adequate protection, because the total collateral package available to the creditor never falls below the level at the time of filing.

Continuous valuation, in contrast, uses the cash that comes into the business at each point in time to create a new, higher, secured claim. Then, if there is a cash shortfall in any month, the debtor must provide new adequate protection, on penalty of relief from stay. This predicament is shown in the next chart, using the same parameters as Chart 5.

**Chart 6: Continuous Valuation**
**Nonfluctuating Fixed Assets; Irregular Cash Proceeds**

This approach again gives the secured creditor greater protection than it would have had, through foreclosure, in the absence of a bankruptcy.

*iv. Excessive valuation expense.* The final difficulty with continuous valuation is the increased administrative burden that it would impose on bankruptcy estates. With traditional adequate protection valuation, there is no need to conduct formal appraisals of the assets securing a claim as long as the assets are acknowledged not to have declined from their value at the time the case was filed. Continuous valuation, in contrast, provides the secured creditor with an incentive to measure every slight increase in value, with the potential for an adequate protection demand in the event that there is ever a decrease from the new, higher level. The estate will always bear the cost of responding to new values claimed by a secured creditor, and, if the creditor's claim ever becomes

oversecured, it may have to bear the costs of the creditor's appraisals as well. If such a system is not required by the Bankruptcy Code, it ought to be avoided. Indeed, one of the reasons for the general rule against postpetition interest on claims is precisely to avoid similar administrative costs. *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 164, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) ("Accrual of simple interest on unsecured claims in bankruptcy was prohibited in order that the administrative inconvenience of continuous recomputation of interest causing recomputation of claims could be avoided.")

■■■ *Dual valuation.* The two methods suggested by the parties in the present case for assessing the protectible interest of a creditor secured by an assignment of rents— single valuation and continuous valuation— are both flawed, for the reasons set forth

above. Each gives inadequate weight to the requirement of Section 506(a), reinforced by its legislative history, that valuation of secured claims for purposes of confirmation is a distinct process from earlier valuation for purposes of determining adequate protection. The single valuation approach errs by assuming that the value of a secured claim for adequate protection, at the beginning of the case, constitutes the value of the claim at confirmation. The continuous valuation approach errs by assuming that, because changes in the value of collateral during bankruptcy should be considered for confirmation, these changes must also be considered for adequate protection. Rather than follow either of these approaches, the better course is to accept the suggestion of *Landing Associates*, 122 B.R. at 292, that it may be appropriate "to value property as of the filing date in order to evaluate whether a creditor's interest has been adequately protected," but, "[w]hen the valuation is for purposes of plan confirmation," to determine value "as of that date."

Delinking adequate protection and confirmation valuations produces a system of dual valuation, like the one that many courts have employed in Chapter 13 cases. *In re Kennedy*, 177 B.R. 967 (Bankr.S.D.Ala.1995), for example, accepts the need to provide adequate protection for the value of a secured claim at the time of the bankruptcy filing (177 B.R. at 971), but insists on compliance with the requirement of Section 506(a) that value be determined in conjunction with any hearing on a plan (177 B.R. at 972–73). The court in *Kennedy* states that this dual valuation rule is the majority view in Chapter 13, and collects decisions applying the rule. 177 B.R. at 971–72.

Applying dual valuation in the context of an assignment of rents in a Chapter 11 cases produces the following results:

■ (1) For purposes of adequate protection, the claim of the secured creditor is fixed as of the date of filing. Section 552(b) proceeds increase the collateral securing that claim, but do not increase the claim for purposes of adequate protection. Accordingly, if the underlying collateral is not declining in value or at risk of declining in value, the additional cash collateral may be used by the debtor to pay administrative expenses, as well as to maintain or improve the underlying collateral or to make payments on the creditor's claim. However, any such expenditures require court authorization after notice and hearing. 11 U.S.C. § 363(c)(2). Thus, the secured creditor has the opportunity of objecting to any expenditures that it believes improperly reduce its collateral.

■ (2) At confirmation, the secured claim is revalued. The total claim is reduced by any payments made by the debtor, and the collateral securing the claim is reappraised. Any proceeds under Section 552(b) that have not been expended by the debtor, and are not necessary to pay expenses of preservation under Section 506(c), increase the amount of the secured claim. Any appreciation in the value of the underlying collateral also increases the secured claim.

■ (3) If the collateral package at the time of confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is entitled to interest and costs under Section 506(b) to the extent of the surplus.

This dual valuation approach is consistent with, if not required by, Section 506(a). Its impact on the bankruptcy process is weighted in favor of neither party. Debtors are likely to have the funds necessary to meet the administrative expenses of their bankruptcy, but they cannot reduce the creditor's secured claim with funds accumulated through delay. The impact of the dual approach can also be illustrated graphically, using the same parameters as Charts 1 and 2. First, if no administrative expenses are paid from the cash collateral, the result at confirmation is the same as it would have been under continuous valuation:

**Chart 7: Dual Valuation**
**Nonfluctuating Fixed Assets; Regular Cash Proceeds; No Administrative Expenses**

Second, if administrative expenses are paid from the cash collateral, the secured claim is reduced, but never below the level of adequate protection:

**Chart 8: Dual Valuation**
Nonfluctuating Fixed Assets; Regular Cash Proceeds; Administrative Expenses Paid

In the present case, insufficient information has been provided to allow a determination whether the retainer sought by A & G may be paid from the accrued rents of the property. However, if the debtor can demonstrate that the property is not declining in value and is not at risk of declining in value, if there are accrued rents in excess of the proposed retainer, and if there is assurance that other administrative expenses are likely to be paid, then the retainer may well be appropriate.

### Conclusion

Ruling on the pending motion will be continued until after a hearing to determine the appropriateness of the retainer sought to be paid, in conformity with the principles set forth above.