**In re DUVAL MANOR ASSOCIATES, Debtor.**

**Bankruptcy No. 95–11844 SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 30, 1996.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

Edward J. DiDonato, DiDonato & Winterhalter, P.C., Philadelphia, PA.

Jack B. Justice, White & Williams, Philadelphia, PA.

## *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

### *Introduction.*

Before the Court is the request of the above Chapter 11 Debtor, Duval Manor Associates ("Duval" or "Debtor") for confirmation of its first amended plan of reorganization. Confirmation is vigorously opposed by the Debtor's sole secured creditor, John Hancock Mutual Life Insurance Company ("John Hancock"), which in turn renews a Motion for Relief from the Automatic Stay that had been provisionally denied pending the ·outcome of the confirmation hearing. For the reasons which follow, the Court concludes that confirmation of the present Plan must be denied. Relatively minor amendment, however, will render the Plan satisfactory. Accordingly, and in view of the otherwise generally positive circumstances of the case, the Court will deny John Hancock's Motion for Relief from the Automatic Stay, schedule a hearing on the Debtor's Objection to John Hancock's proof of claim, and afford the Debtor a brief opportunity to determine thereafter whether it is capable of putting forward an alternative, confirmable plan consistent with the views expressed herein.

### *Background.*

Duval is a Pennsylvania limited partnership which owns an eight story apartment building and adjacent parking lot located,

respectively, at 6350 Greene Street and 6347–51 Greene Street in the Germantown section of Philadelphia. The apartment building houses some 168 units. The Debtor acquired the property in 1986 for $3,200,000 with financing provided by Meridian Bank. Additional financing provided by Meridian enabled the partnership to rehabilitate the property. In 1988, the Meridian indebtedness was refinanced with a loan from John Hancock. That refinancing was itself refinanced by John Hancock in 1994 when the Debtor experienced cash flow problems. Unfortunately, the new terms between the Debtor and John Hancock, which featured a reduced interest rate, proved insufficient to remedy the Debtor's problems and it fell into default. Work out negotiations apparently failed and on March 7, 1995, John Hancock entered judgment by confession against the Debtor in the Philadelphia Court of Common Pleas. This Chapter 11 case was commenced two days later.

John Hancock's security includes a non-recourse first mortgage on the property and an assignment of rents. The latter constitutes the rentals cash collateral within the meaning of 11 U.S.C. § 363. The Debtor has operated during the pendency of this case by utilizing the rentals to pay normal operating expenses in accordance with a series of consensual stipulations between itself and John Hancock. Daily management at the property is provided by Classic Management Company, an entity owned by one of Duval's two general partners.

Approximately three months after the bankruptcy case was commenced, John Hancock sought relief from the automatic stay under both subsections of 11 U.S.C. § 362(d). Specifically, John Hancock asserted 1) that it was entitled to relief under 11 U.S.C. § 362(d)(1) for cause, including a lack of adequate protection, and 2) that it was entitled to relief under 11 U.S.C. § 362(d)(2), because the Debtor had no equity in the subject property and because the property was not necessary for an effective reorganization of the Debtor. An Answer in opposition to John Hancock's § 362 Motion was filed and an evidentiary hearing was held on July 13, 1995.

At that hearing, expert appraisal testimony established that the real property in question had a fair market value of $3,450,000 as of May 11, 1995. (Hearing of July 13, 1995—Exhibit M–1). Also admitted into evidence at that time was a copy of John Hancock's Proof of Claim, (Exhibit M–2) which states an indebtedness as of the petition date in the aggregate sum of $6,039,926.14.

Although the evidence obviously made clear that the Debtor lacked equity in the apartment complex, the record also established to the satisfaction of the Court 1) that the property was being competently managed and maintained, 2) that the Debtor had operated within the confines of its cash collateral agreements, 3) that the Debtor had made certain post petition payments to John Hancock from excess cash flow, and 4) that generally positive trends were developing insofar as increasing tenancies and reducing expenses. Also significant was the fact that only two days prior to the hearing, the Debtor had filed a proposed Disclosure Statement and Plan of Reorganization. Weighing against the foregoing was some disturbing testimony concerning the condition of the building's roof and the cost of needed repairs. On this record as a whole, however, the Court had little hesitancy in denying the John Hancock motion on both counts and continuing the stay in effect until August 24, 1995, the date set for consideration of the Debtor's Disclosure Statement.

John Hancock subsequently interposed various objections to approval of the Disclosure Statement, certain of which addressed matters which were correctable via amendment, and certain of which were deemed by the Court to be more in the nature of feasibility objections to confirmation of the Debtor's reorganization plan. Subject to appropriate amendment, therefore, the Court indicated its intention to approve the Disclosure Statement and schedule the matter for a confirmation hearing. John Hancock, nevertheless, renewed its request for relief from the automatic stay at that juncture, arguing that the Debtor's Plan was patently infeasible, was therefore unconfirmable, and that John Hancock, in turn, was entitled to immediate relief from the auto-

matic stay under the Third Circuit's ruling in *In re Swedeland Development Group, Inc.,* 16 F.3d 552 (3d Cir.1994) (*en banc*). Additional evidence relative to the § 362 issues was offered at the August 24, 1995 hearing, some of which supported John Hancock, but some of which favored the Debtor. At the end of the day, the Court concluded that the stay should be continued in effect until the soon to be scheduled confirmation hearing. This conclusion was reached mindful of the holding of the Circuit Court in *Swedeland,* but was premised on the Court's view that the test of *Swedeland* had been satisfied by the Debtor at that juncture; to wit: the property appeared necessary for an effective reorganization that was in prospect. *Id.* at 567. The Court noted moreover, that in the context of analyzing the second prong of 11 U.S.C. § 362(d)(2) (i.e., necessity of a property for an effective reorganization), the feasibility test is not a rigorous one, nor should the § 362 hearing be transformed into a mini confirmation hearing. John Hancock's case on the points in issue, meanwhile, had not been overwhelmingly brought home.

The Debtor's Amended Disclosure Statement was thus approved by Order dated September 8, 1995, and the matter was scheduled for a confirmation hearing. John Hancock filed timely written objections to confirmation and a contested evidentiary hearing with respect to confirmation was held on November 16, 1995. The parties have briefed the numerous issues in dispute and the matter is now ripe for disposition.

*Discussion.*

█ The Debtor's plan places its creditors into seven classes, as follows:

1. *Class I:* Shall consist of all allowed claims for administrative costs and expenses as defined and provided under 11 U.S.C. § 503.

2. *Class II:* Shall consist of all allowed unsecured priority claims pursuant to 11 U.S.C. § 507(a)(6).

3. *Class III:* Shall consist of all allowed unsecured priority claims including the claims of any federal, state, or local taxing authority pursuant to 11 U.S.C. § 507(a)(8).

4. *Class IV:* Shall consist of the allowed secured claim of the John Hancock Life Insurance Company ("John Hancock"), in an amount to be determined after negotiations between the Debtor and John Hancock or upon the entry of an Order by the Bankruptcy Court establishing the allowed secured claim of John Hancock. Any unsecured portion of the claim of John Hancock shall be treated as an unsecured claim and shall be included with and shall receive the treatment of Class V claims.

5. *Class V:* Shall consist of all allowed unsecured claims against the Debtor whose claims arose prior to the filing of the bankruptcy petition on March 9, 1995 including any allowed unsecured portion of the claim of John Hancock.

6. *Class VI:* Shall consist of all interests of the limited partners of the Debtor.

7. *Class VII:* Shall consist of all interests of the general partners of the Debtor.

Following dissemination of the reorganization plan to creditors, the Debtor's Report of Plan Voting, at Exhibit "A" summarized the results of voting, thusly:

| CLASS | CREDITOR/INTEREST | AMOUNT | VOTE | # OF BALLOTS |
|-------|-------------------|--------|------|--------------|
| II | Priority Claims under 11 U.S.C. § 507(a)(6) | $ 76,747.22 | Accept | 114 |
| II | Priority Claims under 11 U.S.C. § 507(a)(6) | $ 1,755.00 | Reject | 1 |
| III | Governmental Units | — | — | — |
| IV | John Hancock Secured Claim | $3,450,000.00 | Reject | 1 |

| CLASS | CREDITOR/INTEREST | AMOUNT | VOTE | # OF BALLOTS |
|-------|-------------------|--------|------|--------------|
| V | Unsecured Creditors | $ 69,252.75 | Accept | 8 |
| V | Unsecured Creditors | $1,927,406.59 | Reject | 5 |
| VI & VII | General and Limited Partners | — | — | — |

Given the above, it is clear that if the Debtor is to succeed, it must "cramdown" confirmation of its Plan through resort to 11 U.S.C. § 1129(b)(1), which provides, as follows:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on the request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

In this regard, a threshold and potentially dispositive issue is the following hurdle present in 11 U.S.C. § 1129(a)(10):

> (10) If a class of claims is impaired under the plan, at lease one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

The only impaired class alleged to have accepted the Debtor's plan is Class II, the tenant security deposit claimants. Of 115 ballots cast by the holders of Class II claims, 114 claimants, holding security deposits claims in the aggregate amount of $76,747.22, voted to accept the Debtor's plan. According to the Debtor's report of plan voting, this translates into 99% acceptance in number and 97.76% acceptance in amount, statistics which at first blush easily satisfy the criteria for class acceptance set forth in 11 U.S.C. § 1126(c). (i.e., ½ in number; ⅔ in amount). John Hancock argues, however that the class of deposit claimants has been "artificially" impaired by the Debtor causing the class' affirmative vote to fail the 11 U.S.C. § 1129(a)(10) test. As John Hancock notes, a number of courts have held that acceptance by a single artificially impaired class does not satisfy the statutory requirement. *In re Windsor on the River Assocs.*, 7 F.3d 127 (8th Cir.1993); *In re Willows Convalescent Centers Ltd. Partnership*, 151 B.R. 220 (D.Minn.1991); *In re W.C. Peeler Co., Inc.*, 182 B.R. 435 (Bankr.D.S.C.1995); *In re Dean*, 166 B.R. 949 (Bankr.D.N.M.1994); *In re Kellogg Square Partnership*, 160 B.R. 343 (Bankr.D.Minn.1993); *In re Miami Center Assocs., Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla. 1992); *In re Meadow Glen, Ltd.*, 87 B.R. 421 (Bankr.W.D.Tex.1988); *See* Peter E. Meltzer, *Disenfranchising the Dissenting Creditor through Artificial Classification or Artificial Impairment*, 66 Am.Bankr.L.J. 281, 310–320 (1992).[1] While the Court agrees that the proposed impairment of the tenant class is artificial, it disagrees with John Hancock's conclusions based thereon.

In this instance, the Debtor acknowledges an aggregate liability in the sum of $80,000 to tenants who posted security deposits. This money was apparently spent by the Debtor pre-petition and never replaced. The nature of the Debtor's liability for these deposits, as a landlord, is set forth in the Pennsylvania Landlord and Tenant Code at 68 P.S. 250.512(c), as follows:

---

**1.** *See also, In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr.S.D.N.Y.1995) (There must be a showing that a proposed impairment is necessary for economic or other justifiable reasons and not just to achieve a cramdown); *In re Dunes Hotel Assoc.*, 188 B.R. 174 (Bankr. D.S.C.1995); *In re Barakat*, 173 B.R. 672 (Bankr. C.D.Cal.1994); *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760 (Bankr.N.D.Fla. 1994); *In re Daly*, 167 B.R. 734, 737 (Bankr. D.Mass.1994) (contrived and artificial impairment can be viewed as a violation of the requirement of an accepting impaired class, § 1129(a)(10), or the requirement that a plan be proposed in good faith, § 1129(a)(3), or both); *In re Dean*, 166 B.R. 949 (Bankr.D.N.M.1994); *In re North Washington Center Ltd. Partnership*, 165 B.R. 805 (Bankr.D.Md.1994); *In re Lettick Typografic, Inc.*, 103 B.R. 32, 38 (Bankr.D.Conn. 1989).

(c) If the landlord fails to pay the tenant the difference between the sum deposited, including any unpaid interest thereon, and the actual damages to the leasehold premises caused by the tenant within thirty days after termination of the lease or surrender and acceptance of the leasehold premise, the landlord shall be liable in assumpsit to double the amount by which the sum deposited in escrow, including any unpaid interest thereon, exceeds the actual damages to the leasehold premises caused by the tenant as determined by any court of record or court not of record having jurisdiction in civil actions at law. The burden of proof of actual damages caused by the tenant to the leasehold premises shall be on the landlord.

One interpretation, and indeed perhaps the clearest interpretation, of the language of the Debtor's plan is that notwithstanding the landlord's right to withhold a tenant's deposit until such time as premises are vacated, the Debtor intends to return all of the deposits now, albeit in two installments, 30 days apart. Such seemingly enhanced treatment of the deposit claimants is indeed difficult to construe as "impairment." Yet, as various commentators have noted, literal impairment of a claim is a test easily met. Under the provisions of 11 U.S.C. § 1124, "a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." *See Meltzer, supra,* Am.Bankr.L.J. at 310; *see also,* 5 Collier on Bankruptcy ¶ 1124.04[1] 124 (15th ed. 1990). *Accord, In re L & J Anaheim Assocs.,* 995 F.2d 940, 942–43 (9th Cir.1993); *In re Temple Zion,* 125 B.R. 910 (Bankr. E.D.Pa.1991).

The interesting question of enhancement as impairment can be left aside in this instance, as the confirmation hearing testimony of general partner Michael Young made clear that notwithstanding the language of the plan the Debtor does not intend to refund tenant security deposits in full, in advance. Rather, the Debtor intends to return deposits individually at such time as tenants actually vacate premises, albeit in two installments. This clearly is not an enhancement of the tenants rights under the Landlord and Tenant Code (assuming no damage to the tenant's apartment), yet it is perhaps the barest imaginable degree of impairment. Under the landlord tenant code, deposits are not required to be returned before the expiration of thirty (30) days after a tenants vacates. In this instance, the Debtor proposes to pay one half of a deposit when due, and the balance thirty (30) days later. Thus, it is only payment of the second half of a deposit, delayed by thirty days, which represents an "impairment" to the rights of the tenant class. Added to this scenario is the reality that the tenant class is not expected to remove itself *en masse.* Rather, departures and deposit returns will undoubtedly be few in number at any particular point in time. Consistent with this, Young testified that at present only approximately 7 or 8 tenants are awaiting return of their deposits. Given that the typical monthly rentals at the property are in the $500 to $600 range, it can easily been seen that there is little economic impetus underlying the decision to impair the rights of vacating tenants by bifurcating the return of their deposits into two installments. On the contrary, the nominal impairment of the Class is obviously designed specifically to achieve compliance with the requirements of 11 U.S.C. § 1129(a)(10).

■ Whether the Bankruptcy Code permits artificial or technical impairment of claims as a means of satisfying the requirements of 11 U.S.C. § 1129(a)(10) is something of a cutting edge issue in Bankruptcy law today, and there is no appellate authority in this jurisdiction directly on point. There are, however, numerous decisions throughout the country on both sides of the question. Contrasted with those cases cited above (rejecting artificial impairment) are the following. *In re L & J Anaheim Associates, supra; In re Witt,* 60 B.R. 556, 560–61 (Bankr. N.D.Iowa 1986); *In re Consolidated Operating Partners,* 91 B.R. 113, 115–16 (Bankr. D.Colo.1988); *In re Greystone III Joint Venture,* 102 B.R. 560, 570–71 (Bankr.W.D.Tex.), *aff'd,* 127 B.R. 138 (W.D.Tex.1989), *rev'd,* 995 F.2d 1274 (5th Cir.1991). *See also, In re The Beare Company,* 177 B.R. 886 (Bankr.

W.D.Tenn.1994); *In re Hotel Assoc. of Tucson*, 165 B.R. 470 (9th Cir. BAP 1994).

The rationales of the competing positions are deceptively straightforward. Those who would permit artificial impairment note that the literal language of the Code contains no restrictions against artificial impairment. Thus, the established maxim that statutes should be accorded their plain meaning militates in favor of allowing artificial impairment as a means of satisfying the requirements of § 1129(a)(10). *See e.g., Consumer Prod. Safety Comm. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."); *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241–42, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1985). Those who would preclude artificial impairment argue, conversely, that allowing it effectively eviscerates the meaning and purpose of Section 1129(a)(10), producing an absurd result at odds with congressional intent. Established principals of construction likewise militate against adopting such a statutory interpretation. *See, e.g., In re Oxborrow*, 913 F.2d 751, 754 (9th Cir.1990) ("We must avoid statutory interpretation that renders any section superfluous and does not give effect to all of the words used by Congress"); *In re Herbst*, 95 B.R. 98, 100 (Bankr.W.D.Wis.1988) ("The fundamental principle [is] that the statutory construction should not render a statute superfluous."); *Stewart v. Law Offices of Dennis Olson*, 93 B.R. 91 (N.D.Tex.1988) ("A statute should not be interpreted so as to render a provision superfluous or insignificant.") It is easy to agree with both of the foregoing propositions, but exceedingly difficult to reconcile them. Acknowledging what it agrees is a close call, this Court concludes that artificial impairment, while perhaps not philosophically the better view, is nevertheless clearly permitted under the plain meaning of the statute, and that this rule of statutory construction must be observed.

It is less than completely certain, even so, that permitting artificial impairment truly runs afoul of congressional intent. The requirement that the Debtor demonstrate acceptance of its plan by at least one class of creditors impaired thereunder was added to the Bankruptcy Code as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984. It is widely known that the requirement was designed to ameliorate a perceived harshness inherent in the cramdown provisions available under the Code in the wake of the decision in *In re Pine Gate Associates*, 2 Bankr.Ct.Dec. 1478 (N.D.Ga. 1976). Theoretically, the requirement of an accepting impaired class ensures that a given cramdown plan has at least a modicum of support from adversely affected creditors. Construing this requirement to allow *de minimis* impairment of the subject accepting class arguably undercuts that purpose. As the Ninth Circuit noted, however, in its decision permitting *improved* treatment as impairment:

At first blush the idea that an improvement in one's position as a creditor might constitute "impairment" seems nonsensical. It must be recognized, however, that "impairment" is a term of art adopted by Congress to replace the old "material and adverse effect" standard of the Bankruptcy Act. See former 11 U.S.C. § 507 (repealed 1979). Under the old standard, a creditor was entitled to vote on a proposed plan only if it was negatively affected by the plan. This inevitably fostered uncertainty, and invited litigation over whether the value of a creditor's interest would be diminished by a plan. Section 1124 of the Code was enacted to do away with these problems. "By driving a wedge between the concept of impairment and the vagaries of value, parties may know with greater certainty, whether or not they are impaired. This certainty should reduce litigation and aid negotiation toward a plan, the goals which Section 1124 was established to further." *In re Barrington Oaks*, 15 B.R. 952, 963 (Bankr.D.Utah 1981).

*In re L & J Anaheim Associates*, 995 F.2d at 942–43.

This Court agrees that restricting "artificial" impairment could itself give rise to a veritable Pandora's box of related problems, as courts perforce grapple with disputes over the particular degree of class impairment needed to pass muster. Consistent with the foregoing, even some courts which have determined to restrict the availability of artificial impairment have done so, not on the basis that the same is not permitted under a literal reading of the Bankruptcy Code, but on the basis that choosing this means to an end demonstrates a lack of the good faith required of the plan proponent under 11 U.S.C. § 1129(a)(3). *See, e.g., In re Meadow Glen, Ltd.,* 87 B.R. 421 (Bankr.W.D.Tex. 1988). This Court declines also to follow that lead, and agrees instead with the Fifth Circuit Court of Appeals which rejected that argument in *In re Sun Country Development Inc.,* 764 F.2d 406 (5th Cir.1985). Indeed, it seems counterintuitive to assail the good faith of a Debtor who merely avails itself of a right afforded to it under the plain reading of a statute.

Having reached the foregoing conclusions, the plan now on the table will not be deemed to fail for want of the requisite accepting impaired class.[2] This alone, however, does not ensure Duval's success, for there are other serious problems afoot.

### *Interest Rate Analysis*

■ The Debtor's plan provides for payment of John Hancock's allowed secured claim in equal monthly payments based on a 25 year amortization with a final "balloon" payment due in the year 2003. Interest is proposed to be paid at the present contract rate of 7%. For plan voting purposes only, the Debtor and John Hancock agreed to provisional allowance of Hancock's total claim in the aggregate amount of $5,347,791.75, with the secured portion thereof being the $3,450,000 appraised value of the property.

At the outset, the Debtor and John Hancock disagree sharply as to the propriety of the proposed interest rate of 7%. In this respect, John Hancock argues that a 7% discount rate on the payout of its allowed secured claim is inadequate and fails to comport with the following cramdown requirement of 11 U.S.C. § 1129(b)(2)(A)(i)(II):

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

Here again, the Debtor and John Hancock are at loggerheads over an issue near the razor's edge of Bankruptcy law. Again, too, there is no appellate authority in this jurisdiction directly on point. Surprisingly, both parties cite the Court to the opinion of our colleague, Chief Judge David A. Scholl, in *In re River Village Associates,* 161 B.R. 127 (Bankr.E.D.Pa.1993), which suggests that the appropriate rate of interest in this context is the risk free rate, plus an additional premium for risk. Both parties, likewise, agree that the appropriate "premium" for risk is a function of the amount and quality of the collateral, the risk of default, and the length of the payout period. For all their consensus, however, it is clear that the Debtor and John Hancock are viewing the interest rate question through opposite ends of a telescope.

The Debtor's analysis is retrospective and is premised, in part, upon the history between the parties. In this respect, the Debtor emphasizes that the interest rate on the original note between the Debtor and John Hancock (in 1988) was 9.5%. This rate was reduced to the present 7% contract rate in the course of the April 1994 "workout." The Debtor assumes that the current risk free market rate is equivalent to the interest rate for a government bond which would come due in the year 2003, the same year the John Hancock indebtedness would mature under the Debtor's plan. The Debtor maintains that this rate, 5.92% (Wall Street Journal 11–

---

2. The Court notes that in addition to the tenant class, the Debtor's plan also impairs the claims of priority tax claimants and general unsecured creditors. Little, however, can be gleaned from the record concerning the class of tax claimants other than the class is impaired and no votes were cast. At its disclosure statement hearing, the Debtor advised that it anticipated securing an accepting vote in this class. The ensuing interval will give the Debtor a further opportunity to revisit that question and perhaps render the artificial impairment question moot by obtaining acceptance of an amended plan by tax claimants.

16–94, Exhibit D–1) is the most appropriate rate because in this instance the repayment risk to John Hancock, at least insofar as the secured portion of its claim, has actually *decreased* since April 1994. In support of this proposition, the Debtor points to a 28% to 30% vacancy rate in April 1994, reduced now to approximately 18%. The Debtor points also to commensurate improvements in earned income, as well as reduced expenses and other efficiencies. The Debtor notes, too, that certain site environmental problems alluded to by John Hancock have been contained and were, in any event, known to John Hancock when it negotiated the present 7% contract rate in April 1994. As a "concession," the Debtor offers to round the 5.92% interest rate to 6% and to add a 1% premium, thereby leaving the proposed post confirmation interest rate on the John Hancock debt intact at 7%.

John Hancock's analysis, by comparison, is forward looking. It ignores past dealings between the parties and analyzes the proposed post confirmation relationship between the Debtor and itself as if it were the inception of a new lender-borrower relationship. In doing so, John Hancock argues that the appropriate interest rate is 12.44%, comprised of a 5.77% risk-free rate, a 6.11% risk or credit premium, and a 0.56% prepayment premium. In support of its conclusions, John Hancock relies on the opinion and expert testimony of Dr. Paul Kaplan Ph.D. Dr. Kaplan's accompanying report, however, in part accounts for John Hancock's undoing as to the issue at hand. The report (Exhibit H–17), in its introduction, makes the unsurprising observation that "because of the poor financial condition of Duval, it is doubtful that any financial institution would voluntarily make a loan to Duval, even with the property as security." (Exhibit H–17, Report at pg 1). Dr. Kaplan's analysis thus focuses on publicly traded debt to determine an appropriate cramdown interest rate. Using traditional credit analysis ratios, such as debt-to-total capital, and interest coverage, Dr. Kaplan analogizes the Debtor to the issuer of bond likely to be accorded a "B" rating by services such as Moodys, Standard and Poor's and Duffy and Phelps. After calculating these ratios for the Debtor, stan-

dard formulae in turn produce the suggested 12.44% interest rate.

Having considered these divergent points of view, the Court concludes that the Debtor has the better part of the argument. John Hancock's argument represents classic "forced-loan" theory. This theory was specifically rejected by Judge Scholl in *River Village, supra,* and has been rejected by several other courts as well. *See In re Jordan,* 130 B.R. 185, 189 (D.N.J.1991), *see also In re Computer Optics, Inc.,* 126 B.R. 664 (Dist.N.H.1991); *United States v. Doud,* 869 F.2d 1144, 1145 (8th Cir.1989); *In re Oaks Partners Ltd.,* 135 B.R. 440, 444 (N.D.Ga. 1991). As the Court in *In re Oaks Partners Ltd.* concluded, the difficulty with the forced loan analysis is that:

> the evidence is generally inconsistent with the theory, the creditor introduces experts who, like ... (Hancock's expert), testify that there is no market for this loan and that conventional lenders would not make a loan where the debt is equal to the value of the property. After they acknowledge the absence of a market as such, they go on to give their opinions that a lender would only make the loan if the interest rate were such and such. It is no coincidence that the rate to which they opine renders the Debtor's Plan unfeasible. 135 B.R. at 444, 445.

The Court in *In re Computer Optics, Inc.,* likewise stated:

> There is no "market" in the real world for "similar loans" when dealing with a reorganized entity coming out of a Chapter 11 proceeding and it accordingly is not surprising that the case decisions taking such approach exhibit much conjecture and inconsistent results. 126 B.R. at 672.

This Court agrees with Judge Scholl's observation in *River Village,* that adoption of the coerced loan analysis effectively writes cramdown under 11 U.S.C. § 1129(b)(2) out of the Bankruptcy Code in the context of single asset real estate cases. As he, therefore, this Court declines to conclude that our Circuit Court's holding in *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3d Cir.1993), which was written in the context of a Chapter 13 case, mandates a result such as

that which John Hancock seeks herein. Nor does the Court find persuasive John Hancock's argument that the 7% contract rate is *per se* inappropriate because it is a "work-out" rate. In particular, John Hancock's reliance on *In re Gramercy Twins Assoc.*, 187 B.R. 112 (Bankr.S.D.N.Y.1995) for this proposition is misplaced. The observation that work-out loans are not analogous to cram-down plans (*id.* at 123) certainly does not automatically mandate adoption of the coerced loan analysis. The Court in *Gramercy Twins*, moreover, was obviously influenced by the fact that the principal balance of the subject loan had been substantially reduced as part of the parties' pre-bankruptcy workout. No such similar principal reduction is evident on this record.

■ Rejection of the forced loan approach, nevertheless, does not mandate acceptance of the original contract rate. On the contrary, selection of the appropriate discount rate is a fact sensitive, case by case, inquiry which must take into account the risks associated with the Debtor, the security and the plan. One must also remain mindful, however, that the matter is ill suited to refinement with pinpoint precision. In this instance, the Court has carefully studied the evidence submitted and has determined that, in truth, little has occurred in the interval between now and April 1994 to materially or adversely affect the value of the subject property, or John Hancock's interest therein. Hence, John Hancock's expectations of retiring at least its secured indebtedness from its collateral, if that became necessary, should largely be intact. The Court, moreover, reiterates its observations of increased net income, improved occupancy and reduced expenses at the property. Still, all is not rosy. John Hancock's notes, accurately, that historically total income at the property has been decreasing, and there are serious problems with the building's roof which require either a long term replacement/solution, costing anywhere from $85,000 to $125,000, or annual "tire-patch" type solutions costing approximately $20,000 per year. This issue is of more than passing significance, because the Debtor's sanguine projections of future increased cash flow depend at least in part on repair of the roof and rental of the now vacant top floor units. The Debtor's financial projections do not support the inference that a replacement project is feasible in the foreseeable future. They likewise, however, do not foreclose annual maintenance of the roof in such a way as to permit the Debtor to bring the top floor units on line and thereby support its ability to make plan payments *and* adequately maintain the property over the life of the proposed plan term. The proposed capital infusion of the Debtor's general partners (about which more will be said later) add some level of additional comfort on this score. In sum, therefore, this Court rejects the proposed "forced-loan" analysis proffered by John Hancock and concludes that the proposed 7% rate, which really by coincidence is also the parties present contract rate, represents an appropriate discount rate, in conformity with the requirements of 11 U.S.C. § 1129(b)(2)(A)(i)(ii), giving due regard to the subject collateral and the risks attendant to John Hancock under the Debtor's plan.

### *Feasibility*

■ Closely related to the above interest rate analysis is the feasibility test under 11 U.S.C. § 1129(a)(11). In this respect, the Debtor must demonstrate that:

> ... Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The main thrust of John Hancock's objection on this score is that the Debtor's plan is infeasible if the Debtor is required to adopt the high discount rate which John Hancock urges. There never was much dispute on that point however. The Debtor's financial projections for calendar year 1996 (Exhibit D–2) forecast a net income of $373,564, leaving it with a surplus, or cushion, after plan payments and debt service (at 7%) in the range of $40,000 to $50,000. (N.T. 11–16–96 at 29). Given John Hancock's $3,450,000 secured claim, anything much in excess of a 1% increase in the post confirmation discount rate would render the Debtor's projections

close to break even; any more than that would render the plan infeasible. As discussed, however, the Court, has accepted the proposed 7% rate as appropriate, so these arguments are now academic. John Hancock nevertheless maintains that even at a 7% discount rate, the Debtor's plan is infeasible. In this respect, John Hancock presented (through investment officer John Pauksta) its own financial projections for the Debtor for calendar 1996. (Exhibit H–19) In contrast to the Debtor, John Hancock forecasts net income of $291,710 and a shortfall after debt service and plan payments of $24,562. Thus, John Hancock argues, even at 7% the Debtor's plan fails. The Court has carefully considered the evidence and the parties conflicting views on this question, and has concluded that the Debtor's plan is feasible as that term of art is to be construed in this context.

The projections of the Debtor and John Hancock differ in two respects. First, John Hancock predicts smaller gross rental income for 1996; second, John Hancock predicts greater expenses and hence less net rental income. The preponderance of the evidence adduced on these points, however, favored the Debtor. Specifically, John Hancock's insistence that gross rental income will fall short of the Debtor's projections is almost entirely predicated on the fact that historically the projected income level has not been achieved. One must bear in mind, however, that the projected rental increase for 1996 is but a modest 5%, or $26,000. An increase of this magnitude is clearly not a fanciful notion if the 17 top floor units are rendered usable. No evidence to undermine the Debtor's short term plan to rehabilitate and let these units was offered, save John Hancock's skepticism that the roof problem will impede the process. On this latter issue, however, while the cost of outright replacement may be daunting, John Hancock's own appraiser agreed that a present repair of $20,000 will suffice. (See Exhibit M–1— Hearing July 13, 1995 at page 86). The Court declines to conclude that the Debtor's inability to effect a massive, expensive replacement project undercuts the feasibility of a plan which is predicated on repair and not replacement.

The evidence as to expenses likewise favored the Debtor. John Hancock, for example, focused on potential increases in the cost of utilities, but it was unfamiliar with the fact that the Debtor had recently switched to a "dual fuel" system which enables it to utilize both cheaper heating oil, as well as gas. (Hearing 11–16–95 n.t. at 103). This example was characteristic of the differences between the Debtor and John Hancock over expenses. As in the area of utility expenses, the Court, in general, found the Debtor's more intimate acquaintance with day-to-day operations, as well as its responsive answers to areas of inquiry, more probative than John Hancock's analysis, which was predicated almost entirely on a statistical extrapolation of prior experience. John Hancock gives short shrift, moreover, to the teachings of case law on this point. It is well established that the Debtor's burden of proof does not rise to the level of a guarantee of success. On the contrary, as Collier has noted:

> Basically, feasibility involves the question of emergence of the reorganized Debtor in a solvent condition and with reasonable prospects of financial stability and success. It is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success.

5 Collier on Bankruptcy ¶ 1129.02 (15th Ed.1989). *Accord, In re 222 Liberty Associates,* 108 B.R. 971 (Bankr.E.D.Pa.1990).

The Court finds that the Debtor's plan satisfies the foregoing. Hence, John Hancock's feasibility objection must be denied.

■ There is one glitch however. The Debtor assumes that John Hancock's allowed secured claim in the amount of $3,450,000 will be deemed reduced by the $165,000 in "adequate protection" payments remitted by the Debtor to John Hancock during the pendency of this case. Its projected post confirmation debt service is therefore based on a secured claim of $3,285,000. John Hancock, on the other hand, insists that the payments made to it during the pendency of the case must be applied in reduction of its unsecured claim. If they are so applied, the Debtor's post-confirmation debt service will have to be

figured on a secured claim of $3,450,000. At 7%, this will produce additional debt service of roughly $1,000 per month. Once again, the Court notes that the parties have locked horns over an issue about which there is much disagreement.[3]

The issue arises where, as here, post-petition payments are made to an undersecured creditor from cash collateral assets, although the value of the real property itself is at least remaining constant. John Hancock relies on *In re Union Meeting Partners*, 178 B.R. 664 (Bankr.E.D.Pa.1995) and *In re Bloomingdale Partners*, 155 B.R. 961 (Bankr.N.D.Ill.1993), cases which stand for the proposition that rents paid to a creditor post-petition simply reduce the unsecured claim of the creditor. These so called "addition" cases treat post petition rents as a separate component of a secured creditors' collateral package, and view the accumulation of post petition rentals as constituting an increase in the secured portion of the creditors claim under 11 U.S.C. § 552(b). The payment of these rentals to the secured creditor is thus seen as no more than the turnover of collateral to the secured creditor in kind. The turnover, in turn, reduces the creditor's secured claim by an equivalent amount resulting in a "wash" transaction. Addition theory proponents specifically reject the notion that such post-petition payments represent improper interest payments in contravention of the Supreme Court's holding in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

The Debtor, in contrast, embraces the so called "subtraction theory" which maintains that adequate protection is only necessary to offset a decline in the value of the underlying property, and that if rents are paid to a creditor post-petition when they are not needed for adequate protection, the rents must reduce the principal balance of the

creditor's secured claim. *In re Kalian*, 169 B.R. 503 (Bankr.D.R.I.1994); *Confederation Life Ins. Co. v. Beau Rivage, Ltd.*, 126 B.R. 632 (N.D.Ga.1991).

Each of the above analyses seems flawed. A most thoughtful opinion which explores the subject and examines the flaws in great detail is *In re Addison Properties Limited Partnership*, 185 B.R. 766 (Bankr.N.D.Ill. 1995). As its author, Judge Wedoff points out, neither approach gives adequate weight to 11 U.S.C. § 506(a), which provides that valuation of secured claims for purposes of confirmation is a distinct process from earlier valuation for purposes of determining adequate protection. Denominating the subtraction cases as the "single valuation" approach, Judge Wedoff points out that the flaw in the theory is that it assumes that the value of a secured claim for adequate protection purposes, at the beginning of the case, must constitute the value of the claim at confirmation. Denominating the addition cases as the "continuous valuation" approach, he in turn argues that the flaw in the theory is in assuming that because changes in the value of the collateral during bankruptcy should be considered for confirmation, these changes must also be considered for adequate protection.

As a solution, the *Addison Court* adopted a notion gleaned from *In re Landing Associates, Ltd.*, 122 B.R. 288 (Bankr.W.D.Tex. 1990), which it denominated as the "dual valuation" approach. Applying it in this context, the Court stated, works as follows:

(1) For purposes of adequate protection, the claim of the secured creditor is fixed as of the date of filing. Section 552(b) proceeds increase the collateral securing that claim, but do not increase the claim for purposes of adequate protection. Accordingly, if the underlying collateral is not declining in value, the additional cash collateral may be used by the Debtor to pay administrative expenses, as well as to

---

**3.** Law review articles commenting on this issue, and discussing the conflicting case law, include Craig H. Averch et al., *The Treatment of Net Rents in Bankruptcy—Adequate Protection Payment of Interest, Return of Collateral, or Reduction of Debt*, 48 Miami L.Rev. 691 (1994); David G. Carlson, *Adequate Protection Payments and the Surrender of Cash Collateral in Chapter 11 Reorganization*, 15 Cardozo L.Rev. 1357 (1994); and Bonnie K. Donahue & W. David Edwards, *The Treatment of Assignment of Rents in Bankruptcy; Emerging Issues Relating to Perfection, Cash Collateral, and Plan Confirmation*, 48 Bus.Law. 633 (1993).

maintain or improve the underlying collateral or to make payments on the creditors claim. However, any such expenditures require court authorization after notice and hearing. 11 U.S.C. § 363(c)(2). Thus, the secured creditor has the opportunity of objecting to any expenditures that it believes improperly reduce its collateral.

(2) At confirmation, the secured claim is revalued. The total claim is reduced by any payments made by the Debtor, and the collateral securing the claim is reappraised. Any proceeds under Section 552(b) that have not been expended by the Debtor, and are not necessary to pay expenses of preservation under Section 506(c), increase the amount of the secured claim. Any appreciation in the value of the underlying collateral also increases the secured claim.

(3) If the collateral package at the time of confirmation exceeds the amount of the creditor's total prepetition claim, the creditor is entitled to interest and costs under Section 506(b) to the extent of the surplus.

The *Addison* Court notes that the dual valuation approach is consistent with if not required by section 506(a). Its impact, moreover, is weighted in favor of neither party. In particular, debtors are ensured that where collateral value is stabilized, funds to meet administrative expenses are potentially available, thus removing the stranglehold which secured parties frequently possess in single asset realty cases. Yet debtors, correspondingly, cannot reduce a secured creditor's claim with funds accumulated through delay.

■ This Court agrees with the *Addison* Court's reasoning, and accordingly adopts the dual valuation approach as its own herein. There is some sorting out necessary here however. In this instance, without agreement as to the character of post-petition payments, the Debtor has simply remitted a substantial portion of its net cash flow to John Hancock. Only now at this late date have the parties confronted the question of how the payments are to be applied. No provision for payment of the administrative

expenses of this case, moreover, was built into the parties' cash collateral stipulations and John Hancock, for one, questions the feasibility of the Debtor's plan in light of that obligation. For both of the parties, this was obviously a clumsy way in which to have proceeded. It would have been preferable to have either resolved or joined these issues at an earlier time, however neither party deserves to be fully rewarded or fully penalized for this carelessness. A *post hoc* solution must therefore be fashioned. On the strength of evidence which has satisfactorily established that the value of the property is stabilized, the Debtor will be relieved of the obligation to remit future adequate protection payments to John Hancock from net cash flow. No expenditure of such funds for any other purpose, however, shall be permitted pending further Order of Court. John Hancock, in turn, will be permitted to provisionally retain the post petition payments made to it to date. The Debtor will be directed to submit an amended plan within thirty days after the conclusion of proceedings relative to its objection to John Hancock's claim which 1) estimates accrued but unpaid administrative claims through the proposed effective date of the amended plan and 2) provides for payment of such claims (after allowance) either through funds to be disgorged from John Hancock from the excess post-petition payments made to it, or on terms otherwise acceptable to the administrative claimants. In the latter event funds in an equal amount retained by John Hancock shall be deemed to have reduced its secured claim and the plan and revised projections may so provide. All post petition payments to John Hancock in excess of the estimate of administrative claims will be deemed to increase the amount of its secured claim and may be retained by John Hancock pursuant to 11 U.S.C. § 552(b). The Debtor's revised projections which are to accompany its amended plan must take into account the impact on plan payments to the unsecured class of creditors (Class V) which the foregoing modifications may necessitate.[4]

---

4. The deficiency component of John Hancock's claim is given artificial recourse status under the Bankruptcy Code and is included in Class V.

The Amended Plan should likewise, therefore, take into consideration any adjustments to the *unsecured* component of the John Hancock claim

The foregoing, the Court believes, will implement the dual valuation approach of *Addison*, albeit retroactively given the awkward circumstances in which the parties are now situate.

### Absolute Priority

■ Yet still another objection to confirmation raised by John Hancock is the Debtor's failure to satisfy the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B). This rule provides that a Chapter 11 plan cannot be confirmed over the opposition of an impaired class of unsecured claims unless:

... (B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

John Hancock accurately observes that the Debtor's plan clearly does not meet the requirements of above subparagraph (i) in that the proposed dividend to unsecured creditors in Class V is a meager 5%. Similarly, the plan does not qualify for the safe harbor of above subparagraph (ii), under a literal reading thereof, because the plan enables the general partners of the Debtor to retain their partnership interests. Retention of the general partnership interests, however, is predicated on each partner contributing to the reorganized Debtor the sum of $50,000.[5] Through this qualification, the Debtor hopes to satisfy the requirements of the so called "new value" exception to the absolute priority rule. John Hancock notes that neither the

Supreme Court, nor the Third Circuit Court of Appeals has spoken directly on the efficacy of this strategy, however, courts in many districts, including our own have acknowledged and approved the viability of the new value exception. *See e.g., Bonner Mall Partnership v. Bancorp Mortgage Co., (In re Bonner Mall Partnership)*, 2 F.3d 899 (9th Cir.1993); *see also, In re Union Meeting Partners*, 165 B.R. 553 (E.D.Pa.1994), *aff'd*, 52 F.3d 317 (3d Cir.1995); *In re Sovereign Group 1985–27, Ltd.*, 142 B.R. 702, 709 (Bankr.E.D.Pa.1992).[6]

■ Even assuming that the new value exception is available, however, John Hancock insists that the Debtor's plan fails to qualify. Both parties agree on the objective test in this respect. The proposed contribution of new value must be a necessary, substantial present contribution, taking place at or before the effective date of the plan. *In re Union Meeting Partners, supra; In re Sovereign Group, 1985–27, Ltd., supra.* Certain of John Hancock's objections on this point are pure "makeweight." Specifically, John Hancock seems to imply that the plan language is vague or imprecise so as to possibly permit the retention of the ownership interests even if the partners fail to put up the new value contributions. John Hancock likewise protests the fact that the contributions, if they are to be made, are not due until 40 days after the effective date. Query, whether this latter "defect" is not curable merely by pushing the effective date itself back. In any event, the Court is reasonably certain that with only modest tinkering, these objections to the plan are resolvable.

■ A more significant objection on the part of John Hancock is that the proposed new value contributions do not qualify because they are not "substantial," citing, *In re Wynnefield Manor Assoc., L.P.*, 163 B.R. 53,

which may result through resolution of the Debtor's pending objection to the John Hancock claim, a hearing on which will be scheduled as part of the Order accompanying this Opinion.

**5.** The Debtor's plan also affords limited partners the right to maintain their interests for contributions in the amount of $10,000 apiece. No limited partners have opted to do so and the date by which an executed election to do so was required

has passed. No further discussion of this issue, *vis a vis*, the limited partners of the Debtor, is thus necessary.

**6.** This Court itself has acknowledged the vitality of the new value exception on two separate occasions. *In re Eddington Thread Mfg. Co., Inc.*, 181 B.R. 826 (Bankr.E.D.Pa.1995); *In re West Chestnut Realty of Haverford, Inc.*, 177 B.R. 501 (Bankr.E.D.Pa.1995).

56–57 (Bankr.E.D.Pa.1993); *In re Sovereign Group 1985–27, Ltd., supra,* at 710. As the Court in *Sovereign Group* noted, the "substantiality" of a new value contribution is measured by considering its size, its relation to the plan's distribution to unsecured creditors, its relation to unsecured claims against the estate and its relation to a normal market contribution. Having considered these criteria, the Court concludes that the proposed new value contribution qualifies.

The aggregate proposed new value contribution in this case is $100,000. The contribution is necessary to underwrite plan payments and/or for the rehabilitation of vacant units. It represents slightly in excess of 5% of the unsecured portion of John Hancock's claim ($1,897,791), and approximately 4.2% of total unsecured claims. (See n.t. 11–16–95 at 23). The Court declines to find this sum trivial or *de minimus,* as Hancock would urge. One hundred thousand dollars is a substantial sum of money in the abstract and, at 5% of Hancock's unsecured claim, it is higher than the contributions rejected in most of the decisions on which John Hancock relies. It is indeed, moreover, rather paradoxical for John Hancock to argue on the one hand that the Debtor's condition and its prospects are so poor that confirmation of its plan should be denied and the automatic stay lifted, yet on the other hand to argue that a new value contribution of $100,000 is insubstantial, presumably due, at least in part, to the value of the interests to be retained by the partners. John Hancock's objections to confirmation based on violation of the absolute priority rule are thus denied.

### *Liquidation Analysis*

 A final objection which must be addressed goes to the requirement in 11 U.S.C. § 1129(a)(7), that the plan proponent demonstrate that non-accepting creditors will receive more through the plan than they would in a liquidation under Chapter 7 of the Bankruptcy Code. Given the parties' agreement as to the fair market value of the property, John Hancock's objection in this respect focuses not on the liquidation value of the real property in a Chapter 7 case, but instead on the potential for a trustee's recovery from

the Debtor's general partners under 11 U.S.C. § 723(a). The Debtor's liquidation analysis, John Hancock notes, contains no analysis of the financial wherewithal of the Debtor's general partners, and hence of the prospect for a trustee's recovery from them which might cause a potential Chapter 7 case dividend to surpass the proposed 5% dividend to unsecured creditors under the Debtor's Chapter 11 plan. In this regard, John Hancock relies in part on Chief Judge Scholl's statement in *In re Union Meeting Partners,* that "a § 723(a) recovery must be taken into account when performing the § 1129(a)(7) comparison" *Id.,* 165 B.R. at 559. While the stated proposition may be true in some cases, this Court declines to hold it true in every case.

In this case, unsecured trade creditors would not be relinquishing their recourse claims against the Debtor's general partners through confirmation of this plan. Thus any post confirmation recovery against the Debtor's general partners would supplement the dividend paid under the Debtor's plan rather than being a substitute for it. The situation was not different in *In re Union Meeting Partners,* however, there the Court took notice of the fact that the right to pursue the Debtor's principals on recourse trade claims was not the equivalent of the trade creditors right to passively participate in the distribution of an 11 U.S.C. § 723(a) recovery secured by a Chapter 7 Trustee. This Court believes that such an approach puts too fine a point on things. While it is true that in some cases it may be more economical for a creditor to "ride the coattails" of a Chapter 7 Trustee in pursuing recovery against a partnership Debtor's partners, in other cases the reverse may be true. Basing the requirement on this rationale in effect casts the focus of the inquiry as much or more on the circumstances of the creditors, as the circumstances of the general partners of the partnership Debtor. In this respect, it burdens the plan proponent with a potentially unwieldy burden of production and/or proof. Absent a clearer showing that the underlying issue is material and bona fide, and in particular where the issue is raised by a nonrecourse secured creditor on behalf of nondissenting trade creditors, this Court is re-

luctant to impose a broad blanket type requirement such as John Hancock requests. John Hancock's objection as to the Debtor's liquidation analysis will therefore be denied.

***Conclusion.***

Confirmation of the Debtor's plan, as noted, will be denied. The Debtor, however, will be afforded an opportunity to propose an amended plan, consistent this opinion, within thirty (30) days following resolution of the Debtor's objection to John Hancock's proof of claim. A hearing on that claim objection will, in turn, be scheduled as part of the accompanying Order.