In re MARKOS GURNEE PARTNER-
SHIP, Diplomat North, Inc., and
PCS Hotels, Debtors.

Bankruptcy Nos. 91B17242,
91B18792, 91B18793.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 1, 1997.

Richard C. Jones, Jr., Jones & Jacobs, Chicago, IL, for First Midwest Bank/Illinois, N.A.

Catherine L. Steege, Jenner & Block, Chicago, IL, Chapter 7 Trustee.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

These bankruptcy cases, originally filed separately under Chapter 11 but later consolidated and converted to Chapter 7, are now before the court on the motion of a secured creditor for payment of an escrow account. The escrow account was established to provide adequate protection to the moving creditor while the bankruptcy estate was being operated by a Chapter 11 trustee. The issue ultimately raised by the creditor's motion is how to treat allowances for adequate protection when the allowances prove unnecessary to offset a decline in the value of the creditor's protected interest in estate property. As set forth below, a creditor is only entitled to adequate protection to the extent that the value of its protected interest declines prior to the time its claim is satisfied. The court finds that prior to the time the creditor's secured claim was satisfied, its protected interest in assets of the estate did not decline, and so denies the creditor's motion and orders that the escrow account be paid to the Chapter 7 trustee.

### Jurisdiction

Adequate protection is a concept created by the Bankruptcy Code (Title 11, U.S.C.), and hence the present proceeding, which seeks to enforce an order for adequate protection could only take place in a bankruptcy case. Such proceedings "arise in" cases under Title 11, and therefore are within the jurisdiction of the district court pursuant to 28 U.S.C. § 1332(b). *In re Wolverine Radio Co.*, 930 F.2d 1132, 1144–45 (6th Cir.1991). The district court may refer such proceedings to bankruptcy judges pursuant to 28 U.S.C. § 157(a), and by General Rule 2.33, the District Court

for the Northern District of Illinois has done so. Bankruptcy judges are given authority to enter appropriate orders and judgments in core proceedings arising in bankruptcy cases, pursuant to 28 U.S.C. § 157(b)(1). The pending proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(B), since it addresses the allowance or disallowance of claims against the estate.

### Findings of Fact

On August 14, 1991, Markos Gurnee Partnership filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Three weeks later, on September 5, two related entities—Diplomat North, Inc., and PCS Hotels, Inc.—also filed for relief under Chapter 11. On September 24, 1991, a Chapter 11 trustee was appointed to administer the three cases, and on October 21, 1991, the cases were substantively consolidated, creating a single estate. This estate consisted of a hotel and a restaurant business.

The real property on which the hotel and restaurant business was operated was owned (through an Illinois land trust) by three related individuals who controlled the debtors in the consolidated cases described above. These individuals filed their own Chapter 11 cases on November 20, 1991.

The major secured creditor of the hotel and restaurant business was First Midwest Bank/Illinois, N.A. ("the bank"). Prior to the bankruptcy filings, the bank made two loans to the business; these loans were secured by mortgages, an assignment of rents, and a security agreement, all properly recorded. Prior to the time of the bankruptcy filings, the debtors had defaulted on the loans; the bank had commenced foreclosure proceedings in an Illinois state court; and a receiver had been appointed by the state court to operate the hotel/restaurant business. The principal balance of the loans, at the time of the bankruptcy filings, was about $5.2 million, and prepetition accrued interest and attorneys fees added another $200,000, for a total claim against the assets of the consolidated estate of about $5.4 million. The assets securing this claim included the real property involved in the operation of the hotel and restaurant (land and buildings), together with their equipment, furniture, and inventories, as well as any accounts receivable and contract rights. In addition, prior to the time of the bankruptcy filing, the receiver may have accumulated cash receipts that may also have been collateral for the bank.

However, the bank did not have the first priority claim to all of the debtors' assets. Prior to the bankruptcy filings, past due real estate taxes on the property had been sold in a tax sale. The claim of the tax purchaser had to be redeemed in order to avoid a loss of the property to that purchaser, and, at the time of the bankruptcy filing, the cost of redemption was about $160,000. Thus, in order to fully secure the bank's claim, the assets securing the claim would have had to be worth $5.56 million at the time of the bankruptcy filing (so as to cover the $5.4 million claim after deduction of the $160,000 tax redemption).

The parties have agreed that, at the time of the bankruptcy filing and throughout the pendency of the cases in Chapter 11, the debtors' assets were not of sufficient value to fully secure the bank's claim. Nevertheless, the bank took no action to seek adequate protection of its security interest until April 20, 1992, seven months after the initial bankruptcy filing. On that date, the bank presented a motion for relief from the automatic stay imposed by § 362 of the Bankruptcy Code, seeking authorization to proceed with its state court foreclosure action, and estimating that the cost of redeeming the taxes was then $165,000. This motion was never heard on the merits. Instead, on May 29, 1992, the bank, the trustee, and the individual debtors presented an agreed order disposing of the motion. This order, entitled "Order Granting Adequate Protection

and Modifying the Automatic Stay," set forth the following terms of agreement:

- The trustee would make payments to the bank, during 1992, "as adequate protection" according to the following schedule:

  on entry of the order, $28, 176.38;

  on June 30, $112,705.52;

  on July 30, $112,705.52;

  on August 30, $112,705.52;

  on September 30, $112,705.52;

  on October 30, $84,529.14;

  on November 30, $56,352.76; and

  on December 30, $56,352.76.

- The scheduled payments would be "non-refundable."

- The automatic stay would be modified to allow the bank to conclude its state court foreclosure action respecting the real property, including entry of a judgment of foreclosure and sale.

- The automatic stay would continue with respect to the foreclosure sale itself, and the bank would agree not to seek further relief from the stay to allow the sale for a period of four months from the entry of the order.

The bank provided notice of this agreed order, in conformity with Fed.R.Bankr.P. 4001(d)(1), to the twenty largest unsecured creditors and to those parties whom the court had ordered to be provided with service. There was no objection from any party, and the court approved the agreed order without a hearing, pursuant to Fed.R.Bankr.P. 4001(d)(3).

Following the entry of the order, the bank proceeded, as the order allowed, to obtain a judgment of foreclosure, establishing the amount of its claim (without attorney's fees) at about $5.8 million, of which about $400,000 was attributable to interest accruing after the filing of the bankruptcy case. The Chapter 11 trustee also complied with the terms of the order, making the required adequate protection payments through July, 1992.

However, on August 12, 1992, the trustee filed a motion seeking modification of the adequate protection order, reducing future adequate protection payments so as (1) to establish an escrow to allow the redemption of the real property from the sale of the past due real estate taxes, and (2) to provide funds to cure defaults in a franchise agreement. On August 28, 1992, after receiving written and oral argument from the parties, the court granted this motion in part, allowing a reduction of payments for purposes of the tax redemption, because this directly benefitted the bank by removing a prior lien, but denying the requested diversion of agreed adequate protection payments to cure franchise defaults. Accordingly, the trustee was allowed to reduce the scheduled payment for the month of August from $112,705.52 to $30,172.33, withholding $82,533.19 for a portion of the funds necessary for the tax redemption. The payment of $30,172.33 made by the trustee in August brought the total of adequate protection payments to $283,759.75.

During the next two months, the Chapter 11 trustee attempted to obtain confirmation of a plan of reorganization, without making any additional adequate protection payments. The attempt at reorganization did not succeed. On October 28, the court denied a motion of the Chapter 11 trustee and the individual debtors to incur additional debt, granted a motion of the bank to proceed with its foreclosure sale, and ordered that the trustee place the $82,533.19 withheld from the August adequate protection payment into an escrow account pending further court order.

The foreclosure sale was actually conducted on December 7, 1992, after another unsuccessful attempt by the Chapter 11 trustee to obtain financing. At the sale, the bank purchased the property, bidding in $5.3 million, approximately $100,000 less than the amount of its prepetition claim. Also on December 7, 1992, the bank used its own funds both to redeem the property from the tax sale (expending about $180,-

000), and to pay the 1991 taxes that became due during the year 1992 (expending about $90,000).

Apart from losses due to accruing real estate taxes and redemption penalties, there is no evidence that the value of the hotel/restaurant business declined during the time that it was operated in Chapter 11. Also, at no time during the period in which the hotel/restaurant business was being operated in Chapter 11 did the bank assert that any of the proceeds of the business were collateral for its loans. The motion for relief from stay did not address this issue, and the Chapter 11 trustee operated the business without the segregation of proceeds that would be required of cash collateral under § 363(c)(2) of the Bankruptcy Code. The only cash segregated by the trustee was the $82,533.19 withheld from the August adequate protection payment. Following the foreclosure sale, these funds remained in escrow, prompting the bank, on December 10, to file the pending motion, which seeks to have the escrowed funds paid to the bank.

The consolidated cases were converted to Chapter 7 on December 17, 1992, and a new Chapter 7 trustee was appointed on December 22. The Chapter 11 trustee turned over to the new trustee all of the cash remaining from the hotel/restaurant business, but this cash was insufficient to pay the administrative expenses that arose during the Chapter 11 case. For this reason, among others, the new trustee opposed the bank's motion to obtain the escrowed funds. The parties briefed and argued the motion, and the court took it under advisement. Thereafter, the court raised additional issues, which required further factual submissions, and legal argument.[1]

## Conclusions of Law

*Background: the nature of adequate protection.* In order to understand the issues presented by the pending motion, it is helpful first to review several points concerning adequate protection:

■ First, the Supreme Court has determined that "adequate protection" is intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate, rather than to compensate the creditor for the delay imposed by the bankruptcy in its ability to pursue nonbankruptcy remedies (like foreclosure) against the property. *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

■ Second, pursuant to § 361 of the Bankruptcy Code, if a creditor is threatened with a decline in the value of its interest in the estate's property, the estate must take action to make up the decline, either through cash payments or liens on other property, or through some other method that provides the "indubitable equivalent" of the creditor's interest. If the estate fails to provide adequate protection, through these means, in the face of a decline in the value of a creditor's interest in the estate property, the creditor is entitled to relief from the automatic stay, allowing it to pursue nonbankruptcy remedies against the property securing its claim. 11 U.S.C. § 362(d)(1).

■ Third, pursuant to § 363(e) of the Code, property of the estate that secures a claim of a creditor can be used by the estate to pay administrative expenses and ordinary course business expenses, as long as the creditor's interest is adequately pro-

---

1. In particular, in response to the court's inquiry as to the status of the bank's collateral at the time of the filing of this case, the bank asserted that its prepetition collateral included $200,000 in cash receipts. The Chapter 7 trustee disputed this contention, and the court set a hearing on the issue. At this hearing, the bank declined to present any evidence to support its assertion. Accordingly, the court will not consider the existence of any prepetition cash receipts in ruling on the pending motion.

tected. Thus, when a claim is secured by estate property worth more than the claim itself, the estate may make expenditures from the surplus (the "equity cushion"). *In re James Wilson Assocs.*, 965 F.2d 160, 171 (7th Cir.1992). However, when the estate property securing a creditor's claim is in the form of cash or cash equivalents—what the Bankruptcy Code calls "cash collateral"—the estate may not use the property without a court order or the creditor's consent. 11 U.S.C. § 363(c)(2).

■ Fourth, as this court held in *In re Addison Properties Limited Partnership*, 185 B.R. 766, 784 (Bankr.N.D.Ill. 1995), the value of the secured creditor's interest in estate property, for purposes of adequate protection, is measured as of the filing of the bankruptcy case. *Accord, Homestead Partners, Ltd. v. Condor One, Inc. (In re Homestead Partners, Ltd.)*, 200 B.R. 274, 281 n. 6 (Bankr.N.D.Ga.1996); *In re Duval Manor Assocs.*, 191 B.R. 622, 633 (Bankr.E.D.Pa.1996). Where the value of the collateral is not sufficient to secure the entire claim of a creditor, then, under § 506(a) of the Code, the creditor has a secured claim, subject to adequate protection, limited to the value of the collateral securing the claim as of the time of the bankruptcy filing.

■ Fifth, § 552(a) of the Bankruptcy Code states the general rule that property acquired by an estate after the commencement of the case is not subject to any prepetition security agreements, and § 552(b) creates an exception for certain postpetition proceeds of estate property. Property falling within the proceeds exception of § 552(b) is subject to prepetition security agreements, and therefore is additional collateral securing the creditor's claim under § 506(a). However, the acquisition by the estate of additional collateral postpetition does not increase the value of the claim subject to adequate protection. If the value of the original collateral has not diminished, proceeds under § 552(b) may be used—pursuant to court order—to pay ordinary business expenses and ad-

ministrative expenses, consistent with adequate protection. *Homestead Partners, Ltd. v. Condor One, Inc. (In re Homestead Partners, Ltd.)*, 200 B.R. 274, 281 n. 6 (Bankr.N.D.Ga.1996); *In re Duval Manor Assocs.*, 191 B.R. 622, 633 (Bankr.E.D.Pa. 1996); *In re Addison Properties Limited Partnership*, 185 B.R. 766, 784 (Bankr. N.D.Ill.1995).

■ Sixth, to the extent that § 552(b) proceeds are not required either to make up for a decline in the value of the original collateral or to pay ordinary business and administrative expenses, the additional collateral is taken into consideration in revaluing the creditor's secured claim at the time the claim is satisfied, either through a plan of reorganization or through direct payment of the claim. If the value of the collateral at the time of claim satisfaction is less than the amount of the creditor's total prepetition claim, the creditor is given an unsecured claim for the deficiency, pursuant to § 506(a). If the value of the collateral at the time of claim satisfaction is more than the amount of the creditor's prepetition claim, that claim may be increased by postpetition interest and contractually specified fees and costs, pursuant to § 506(b). *Homestead Partners, Ltd. v. Condor One, Inc. (In re Homestead Partners, Ltd.)*, 200 B.R. 274, 281 n. 6 (Bankr.N.D.Ga.1996); *In re Duval Manor Assocs.*, 191 B.R. 622, 633 (Bankr.E.D.Pa. 1996); *In re Addison Properties Limited Partnership*, 185 B.R. 766, 784 (Bankr. N.D.Ill.1995).

■ *The present dispute.* Applying these principles to the present case requires four separate determinations: first, the value of the bank's allowed secured claim (*i.e.*, the value of its interest in the estate's property), subject to adequate protection; second, the extent to which the value of that claim declined during the pendency of the bankruptcy (*i.e.*, the amount of required adequate protection); third, the proper treatment of any adequate protection payments in excess of

those required; and fourth, the extent to which any § 556(b) proceeds of the hotel/restaurant business may affect the treatment of excess adequate protection payments.

*1. The value of the bank's secured claim subject to adequate protection.* The value of the bank's secured claim at the outset of the case—the claim subject to adequate protection—is somewhat difficult to determine, because the relevant factual issues were not addressed during the pendency of the cases in Chapter 11. For example, it was only after the conversion of the case, and after inquiry from the court, that the parties considered whether the bank's claim was undersecured. Nevertheless, it is possible to reconstruct the value of the bank's claim.

As noted above, the bank had a total claim of $5.4 million at the outset of this case, and the real property securing the claim was then subject to a prior claim of $160,000 arising out of unpaid taxes. The parties have stipulated that the assets securing the bank's claim—real property, equipment, inventory, accounts receivable, and contract rights—were at all times worth less than the $5.56 million that would have been needed to fully secure the bank's claim. At the outset of the case, then, the value of the secured portion of the bank's allowed secured claim, under § 506(a) of the Bankruptcy Code, was less than its total $5.4 million claim. The parties have presented no evidence as to how much less than $5.4 million the secured portion of the bank's claim may have been. However, the bank purchased the property at the foreclosure sale, net of taxes, for $5.3 million, and there is no evidence that the property itself declined in value during the proceedings. Thus, the property could not have been worth more than $5.3 million at the outset of the case, and the bank's secured claim, all of that time, was no more than $5.3 million, leaving the bank with an unsecured claim of at least $100,000.

*2. The decline in the value of the secured claim during the bankruptcy.* As the bankruptcy progressed, the value of the bank's secured claim declined in only one respect: current real estate taxes accrued on the property, and penalties accrued on the tax redemption. These taxes and penalties, having a higher priority than the bank's claim, reduced the value of the real property available to the bank. The real estate taxes incurred during the bankruptcy were about $90,000. The increased redemption penalties were about $20,000 (the difference between the $160,000 required at the outset of the case and the $180,000 that the bank paid to redeem the property at the time of the foreclosure sale). The total decline in the value of the bank's secured claim, during the pendency of the case, was thus $110,000.

As noted above, the bank actually received payments of about $284,000, and so received, in adequate protection payments, about $174,000 more than the amount needed to provide adequate protection, without considering the roughly $83,000 in escrow.

*3. Accounting for the adequate protection payments.* The bank's position in the dispute over the handling of the escrow account has always been straightforward: its agreed order entitled it to specified adequate protection payments, and these payments were "nonrefundable." From this, the bank concludes that it is entitled both to keep the payments that it has already received, and to receive the funds that were escrowed, since these funds were taken from one of the adequate protection payments. But implicit in the bank's argument is another conclusion that it does not state: that its secured claim should not be reduced by any of the adequate protection payments, so that it should be able to retain, in addition to these payments, the entire value of the collateral it obtained in the foreclosure sale. This method of accounting for ade-

quate protection payments does not withstand scrutiny.

To understand the error in the bank's analysis, it is useful to consider a hypothetical situation: a Chapter 11 case in which (1) a lender has a total claim of $100, (2) the claim is secured by assets worth $75 at the time the case is filed, and (3) adequate protection payments of $40 are made by the debtor during the pendency of the case. In this hypothetical, the lender, like the bank in the present case, is undersecured, and so, pursuant to § 506(a), the lender has two claims at the beginning of the case: an allowed secured claim, subject to adequate protection, equal to its interest in the collateral, in the amount of $75, and an unsecured claim of $25.

If the adequate protection payments were in the correct amount, the value of the collateral securing the lender's claim would have declined by $40 during the course of the case. As a result, when the collateral was disposed of, the lender would have a secured claim of $35 (reflecting the decreased value of the collateral), a payment of $40, making up for the decline, and its $25 unsecured claim. The adequate protection payments thus serve as a kind of prepayment of the secured claim. If the collateral were entirely used up during the case, the entire value of the original secured claim would properly be paid as adequate protection, and only the unsecured claim would remain.

But what if the collateral does not decline in value? In that case, the adequate protection payments must still be seen as prepayments of the secured claim, so that, when the collateral is disposed of, the creditor receives the amount of its original secured claim reduced by the adequate protection payments. *In re Spacek*, 112

B.R. 162, 165 (W.D.Tex.1990) ("[S]ince the value of the collateral has not decreased during the case, the adequate protection payments made to Bank during the case must be applied against the secured portion of Bank's indebtedness."). In the hypothetical, the creditor, having received adequate protection payments of $40, would have a secured claim of $35 at the end of the case, and an unsecured of $25. If the collateral is sold for $75, the lender would be entitled to payment from the proceeds of only the $35 secured claim, with the remaining sale proceeds becoming unencumbered property of the estate, against which the lender's $25 claim (as well as other unsecured claims) could be asserted. Under the theory espoused by the bank in the present proceeding, the hypothetical lender would keep its adequate protection payments, and then assert its entire original secured claim against the proceeds of the collateral sale, thus obtaining $115 on its $100 total claim (and perhaps being able to assert its $25 unsecured claim as well). In the extreme case, where adequate protection payments are made in an amount equal to full original value of the collateral, the bank's position would be that the secured creditor may both keep the payments and take the entire proceeds of the sale of the collateral, thus being paid twice on its secured claim.[2]

In the present case, the bank has already received $174,000 in adequate protection payments not needed to offset a decline in the value of its interest in the debtor's property. This amount must be deducted from the amount of the bank's allowed secured claim. Thus, at the time of the foreclosure sale, the bank would not have been entitled to retain the full amount of the sale proceeds in satisfaction

---

2. The bank appears to assume that because its adequate protection payments were "nonrefundable," they should have no effect on the value of its secured claim, and hence be some sort of interest payment. However, interest payments on undersecured claims are expressly prohibited by § 506(b), which allows payment of interest only to the extent that the

creditor is oversecured. *Spacek*, 112 B.R. at 165 ("Clearly, the adequate protection payments cannot be applied by the Bank against interest or simply retained as 'lost opportunity costs' as the Bank is an undersecured creditor."), citing *Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

of that claim. Rather, unless there was an offsetting increase in its secured claim, the bank should have been required to return $174,000 to the estate, and would certainly have no claim to the additional adequate protection payments now in escrow.[3]

■ *4. The impact of proceeds of the estate's business.* The only argument that the bank has for asserting that its secured claim should be increased as of the time of the foreclosure sale is based on the proceeds generated by the operation of the debtors' hotel/restaurant business during the pendency of the Chapter 11 case. The bank asserts, in effect, that most of these proceeds were its collateral, pursuant to § 556(b), and that these proceeds constituted cash collateral under § 363(a). On this premise, the bank contends that, pursuant to § 363(c)(2), it was improper for the debtor to expend the proceeds without the bank's express consent, and that the proper remedy for the debtor's action in using the proceeds is to give the bank a lien on all of the debtor's unexpended funds. Thus, the bank can assert that all of the proceeds of the estate's business served to raise the value of its secured claim at the time of the foreclosure sale, so that it was entitled, in satisfaction of its secured claim, to (1) the adequate protection payments it received, (2) the proceeds of the foreclosure sale, and (3) the escrowed funds.

In response to this argument, the trustee asserts that very little of the proceeds of the debtors' business were collateral for the bank's loans pursuant to § 552(b), and that, to the extent the bank did have a lien on any of the debtors' proceeds, the bank lost its claim to the lien by not asserting it in a timely fashion, since it is now impossible to trace whatever proceeds may have been subject to the bank's lien. The dispute as to the extent of the bank's lien on proceeds of the debtors' business raises significant and complex legal issues and factual questions that again are difficult to resolve at this point in the proceedings.[4]

---

**3.** The fact that relief from the automatic stay was granted to allow the bank to complete its foreclosure sale did not deprive the estate of a claim to any sale proceeds in excess of the amount of the bank's allowed secured claim. *Nebel v. Richardson (In re Nebel),* 175 B.R. 306, 312 (Bankr.D.Neb.1994) ("Relief from an automatic stay entitles the creditor to realize its security interest or other interest in the property, but all proceeds in excess of the creditor's interest must be returned to the trustee.") (citing *Killebrew v. Brewer (In re Killebrew),* 888 F.2d 1516, 1520 (5th Cir. 1989))

**4.** The legal questions include the following:
(1) Prior to the 1994 amendments to the Bankruptcy Code, did hotel receipts constitute "rents" under § 552(b), and is the question to be determined by reference to the law of the state in which the hotel is located, or to some uniform definition of "rents" for purposes of § 552(b). There is conflicting authority both on these questions. *See, e.g., Financial Security Assurance, Inc. v. Days California Riverside Limited Partnership,* 27 F.3d 374, 376 (9th Cir. 1994) (state law applies; room revenues are "rents," revenues from other hotel services are accounts); *Financial Security Assurance, Inc. v. Tollman–Hundley Dalton, L.P.,* 74 F.3d 1120, 1124 (11th Cir.1996) (federal law applies; all hotel revenues are rents); *In re General Associated Investors Ltd. Partnership,* 150 B.R. 756 (Bankr.D.Ariz.1993) (federal law applies; hotel receipts are accounts, not rents; *Bellevue Place Assoc's v. Caisse Centrale Des Banques Populaires (In re Bellevue Place Assoc's),* 173 B.R. 1009 (Bankr.N.D.Ill.1994) (state law applies; hotel receipts are rents).
(2) Although the initial proceeds of the debtors' restaurant operation were unquestionably "proceeds" of the bank's prepetition collateral (such as the food that constituted the restaurant's inventory), to what extent can the bank claim a lien on the proceeds of inventory that was not in existence at the time of the filing, in light of the bank's failure to seek a replacement lien. Or, to put the question in another way, should the penalty for the debtor's failure to segregate the initial cash proceeds (as required for cash collateral) be the imposition of a lien on subsequent proceeds? If so, what should the amount of the lien be? The scant authority cited by the parties is not in agreement. *Freightliner Market Development Corp. v. Silver Wheel Freightlines, Inc.,* 823 F.2d 362 (1987), indicates that replacement liens may be appropriate; *In re Gemel International, Inc.,* 190 B.R. 4, 11 (Bankr.D.Mass.1995), indicates that they may not be.

However, it is not necessary to address these questions, because even if all of the proceeds of the debtors' operations were collateral of the bank, the funds in the escrow account should still be paid to the estate, as necessary to pay administrative expenses generated during the pendency of the case in Chapter 11.

As noted above, § 552(b) proceeds, if they are not needed to offset a decline in the value of a creditor's secured claim, may increase the value of that claim, but only if they are not expended for administrative expenses during the Chapter 11 case. *Homestead Partners, Ltd. v. Condor One, Inc. (In re Homestead Partners, Ltd.)*, 200 B.R. 274, 281 n. 6 (Bankr. N.D.Ga.1996); *In re Duval Manor Assocs.*, 191 B.R. 622, 633 (Bankr.E.D.Pa.1996); *In re Addison Properties Limited Partnership*, 185 B.R. 766, 784 (Bankr.N.D.Ill. 1995).

In the present case, there are substantial administrative expenses still outstanding from the operation of the debtors' estate in Chapter 11, including unpaid state taxes, dealt with in a prior opinion of this court. *In re Markos Gurnee Partnership*, 163 B.R. 124 (Bankr.N.D.Ill.1993). The Chapter 11 trustee has filed (on March 11, 1993) a schedule listing almost $210,000 in unpaid postpetition liabilities incurred during the Chapter 11 case. Thus, although the escrow account had not been expended at the time the bank's claim was satisfied, neither had the administrative expenses been paid, and no court order had been entered determining how the escrowed funds (or the prior adequate protection

payments) should be applied to the bank's claim. A similar situation arose in the *Duval* case:

> [W]ithout agreement as to the character of post-petition payments, the Debtor has simply remitted a substantial portion of its net cash flow to [the secured creditor]. Only now at this late date have the parties confronted the question of how the payments are to be applied. No provision for payment of the administrative expenses of this case ... was built into the parties' ... stipulations.

191 B.R. at 634. The court dealt with this problem in *Duval* by making provision for payment of administrative expenses, and allowing the creditor an increase in its secured claim only to the extent that the proceeds of the debtor's operations were not necessary to pay administrative expenses. *Id.* A similar result is required here: the bank is not entitled to an increase in its secured claim from § 552(b) proceeds until administrative claims from the Chapter 11 case have been satisfied.

In this case, it appears that the unpaid administrative expenses from the Chapter 11 case exceed the amount of the escrowed funds now in dispute. Accordingly, even if the escrowed funds are entirely composed of § 552(b) proceeds, none of these funds serve to increase the amount of the bank's secured claim.

*The disposition of the escrow account.* As discussed above, the funds in the disputed escrow account were not needed to provide adequate protection to the bank

(3) To the extent that there is a question regarding the extent of the proceeds that constitute the bank's collateral, which party has the burden of proof on the question. Again, there is scant authority, and *Freightliner Market* and *Gemel* point in opposite directions.

(4) To what extent can the bank be said to have waived its claim to a lien on proceeds under § 552(b) or to be estopped because it did not assert the lien prior to the debtors' use of the proceeds in its business? While the legal standards for waiver and estoppel are well established, they raise difficult factual questions: for example, to what extent did the Chapter 11 trustee rely on any representations by the bank that it was not claiming a lien on the proceeds of the debtors' operations?

(5) Although not addressed by the parties, there is a further issue: if the bank would otherwise have a lien on all of the proceeds of the debtors' business pursuant to § 552(b), to what extent should the court, based on the equities of the case, order otherwise, as allowed by § 552(b) itself. *See In re Hanna*, 912 F.2d 945, 951 (8th Cir.1990).

for any decline in the value of its interest in the debtors' property—the adequate protection payments it has already received more than accomplished that purpose. At the same time, the escrowed funds cannot be paid to the bank on the theory that, as § 552(b) proceeds, they increased the amount of the bank's secured claim, because they are needed to pay administrative expenses from the operation of the Chapter 11 case. Thus, the bank's motion for payment of the escrow account must be denied, and the escrowed funds paid to the Chapter 7 trustee. In the event that the allowed Chapter 11 administrative expenses do not exceed the amount of the escrowed funds, the court will consider a further motion from the bank for payment of the balance of the escrow.

### Conclusion

For the reasons stated above, the bank's motion for payment of escrowed funds is denied, and the funds are ordered to be paid to the Chapter 7 trustee. A separate order will be entered in conformity with this opinion.